[Crim. No. 4490. In Bank. Jan. 18, 1946.]

In re MIKE MARVICH, on Habeas Corpus.

Mike Marvich, in pro. per., for Petitioner.

Robert W. Kenny, Attorney General, Walter L. Bowers, Assistant Attorney General, Eugene M. Elson, Deputy Attor-

ney General, Fred N. Houser, District Attorney, and Harry F. Keeler, Deputy District Attorney, for Respondents.

EDMONDS, J.—Mike Marvich was charged with two crimes of robbery and a judgment of conviction was affirmed. (*People v. Marvich*, 44 Cal.App.2d 858 [113 P.2d 223].) In the present original proceeding, by writ of habeas corpus, Marvich is endeavoring to obtain his release from the state prison upon allegations that he was held to answer and convicted upon the perjured testimony of Edgar J. Black procured by and given with the knowledge of the prosecuting officers.

Following the denial of a writ, the Supreme Court of the United States, upon certiorari, remanded the cause for further proceedings (320 U.S. 712 [64 S.Ct. 193, 88 L.Ed. 418]) which were initiated by an order appointing Honorable A. L. Pierovich, Judge of the Superior Court of Amador County, a referee to take testimony and make findings of fact upon the issues presented by Marvich's allegations. The order fixed the scope of the reference by the following questions: "(1) Did any witness who testified against Mike Marvich in the trial which led to his conviction on the charges for which he is now deprived of his liberty, commit perjury as defined in section 118 of the Penal Code of the State of California; that is, did such witness testify to any material matter which he knew to be false? (2) In the event that any witness did commit perjury, did the representatives of the State of California, the District Attorney, or any of his deputies or assistants cause or suffer such testimony to be introduced knowing that such testimony as given was perjured?"

It appears that two complaints were filed against Marvich. In one of them, he was accused of robbing Chester E. Slocum on March 31, 1940, and taking $2,300 from him. By the other complaint, he was named with James W. Gibbons as one of the persons who, in June of the same year, robbed Virgil White of $850. At the times of these robberies, Slocum and White, as partners, were engaged in the business of distributing the Los Angeles Examiner in the city of Long Beach and each robbery occurred at the office maintained by them.

A week after the second robbery, Marvich was arrested near San Diego. Gibbons was later taken into custody at Omaha, Nebraska. Following a preliminary examination upon each complaint, Marvich and Gibbons were held to answer.

In the superior court, by stipulation of counsel, the two cases were consolidated for trial. The jurors being unable to agree upon a verdict, the court declared a mistrial. At the second hearing, each of the defendants was convicted.

As grounds for relief by habeas corpus the petitioner asserts that he was held to answer upon the testimony of Black who, as a witness for the State at the first trial, repeated that testimony and then told a different story more directly implicating Marvich in the robbery of March 31st. The petitioner alleges that in explanation of the change in testimony, the witness stated that during a recess he had been talking with the prosecutor and Deputy Sheriff Mason. At the second trial, Marvich declares, the witness repeated his last version of the occurrences of March 31st and during the trial, ''out of hearing of the jury and petitioner, the trial Judge, prosecutor and petitioner's attorney all conceded that said State's witness was giving perjured testimony.'' Notwithstanding these facts, the petition concludes, the prosecutor in his argument to the jury vouched for the truthfulness of the testimony of Black, knowing that it was perjured.

Marvich's petition also includes the allegations that after he and Gibbons were convicted, Harry Keeler, the Deputy District Attorney who represented the State, asked them for certain data to be presented to the Board of Prison Terms and Paroles in their behalf. When Marvich asked Keeler why he wished to do this after having used perjured testimony, the petition continues, Keeler replied that he did not like the way he secured the convictions; that he had made Black, who could be sent to prison for life as an habitual criminal because of two prior convictions, change his testimony; ''that petitioner and Gibbons should have accepted the prosecutor's offer to plead guilty to a lesser offense, for petitioner and Gibbons did not have a chance to win the case as long as the prosecution had Eddie Black for a witness.''

Pursuant to the order of reference, several hearings were held at which Edgar J. (Eddie) Black and eight other persons testified. The record of the proceedings also includes the transcripts of the testimony taken at the preliminary examinations and the transcript of each of the trials in the superior court. According to these transcripts, at the first trial, Black testified that he first met Marvich about the middle of March, 1940. Meyer Kroll, Black's half-brother, lived with Black and brought Marvich to their home. Late on a Sunday evening,

about a week after the first meeting, Black and his wife were in their home at San Diego. Hearing conversation, Black investigated and found Kroll and Marvich in another room. They showed him a suitcase with money in it. Some of the rolls of silver were marked, "Los Angeles Examiner." Black asked, "My God, where did you get it? He says, 'shut up. Just got this from the Los Angeles Examiner.'" At a later time, which Black fixed as June, 1940, Marvich left a package containing silver coin at Black's house.

Black also told the jury that before March, 1940, he had bought a gun and given it to Kroll. Later he saw the same gun in the possession of Marvich.

According to the record of this trial, immediately following a recess, Deputy District Attorney Keeler reported to the court that Black had asked him for an opportunity to correct certain errors in his testimony given upon direct examination. Recalled to the witness stand for that purpose, Black changed his testimony and admitted that his prior statements were untrue. He then declared that on March 31st, he accompanied Marvich and Kroll from San Diego to Long Beach. The trip was made in Black's automobile which he had loaned to them with the knowledge that they were going to rob the office of the Los Angeles Examiner.

After reaching Long Beach, the trio continued on to Los Angeles, Black doing the driving while Marvich and Kroll looked for a car to steal. Later they went back to Long Beach and, at a skating rink, Black left his companions, who continued on their way in his automobile. They returned for him three or four hours later and he got into the car with them. The trio started for San Diego but seeing a lot of money in the car, Black became frightened and left the automobile. He then went back to Long Beach and, later in the evening, returned to San Diego by bus. Eventually he received ninety dollars out of "this haul."

At this trial there was no inquiry as to how Marvich was dressed on the night of the robbery, and Black did not testify that Marvich, at any time, put on or took off a sailor's uniform. When asked if he brought a sailor from San Diego to Long Beach, Black replied, "No." But in the second trial Black told the jury that when he met Marvich and Kroll at the skating rink, Marvich was taking off a sailor's uniform which he tossed out of the car as they drove away from Long Beach.

When called as a witness before the referee, Black was

asked: "You told one story at the preliminary hearing, and at the first trial of the case, you testified to substantially the same story that you told at the preliminary hearing. Then a recess was called, and you were outside there talking to A. B. Mason . . , Deputy Sheriff of San Diego County. Did he ask you to change your testimony?" Black's reply was: "Well, at that time he did not, but on several occasions, he did ask me to change my testimony."

Upon further examination, Black declared Mason asked him to change his testimony "or else." But when asked: "Do you remember what part of the testimony Mason asked you to change, or what he told you to testify to?" Black answered: "No, I don't. There was so many questions involved, that they would fill a whole book. I don't remember none of them." When further pressed as to whether Mason asked him to testify concerning particular facts, Black said: "If your Honor pleases, I would like to say a few little words, if I may at this time. Some years ago,—I was living in San Diego at the time,—I had my family—when that crime was committed,— after the crime, I was really scared, and Mr. Mason at the time told me—'Well, you know what predicament you are in,— if you don't testify the way you are supposed to, you know what will happen to you.' And being afraid for my family,—not only my family, but myself, also, I testified to that fact,—a lot of it,—quite a few of it was untrue at the time, and at this time, I have got it out of my memory, and I have forgotten all about it, I am living a decent life, and I don't want to remember anything that happened years ago. Now that I am practically a changed person, and I have got a nice family, and I want to continue to do so at this time, and I came up here at my own request."

The referee then took up the questioning. "What parts of this testimony did Mr. Mason ask you to testify to?" Black's answer was: "That I don't remember at this time, your Honor. There was some testimony that he told me to change my music, or I would know the consequences if I didn't. At the time I was a felon,—a long time before,—and he knew it."

Urged to be more specific, Black was asked: "You can't tell us at this time just what testimony or what parts of your testimony were influenced by Mr. Mason?" The reply was: "No, your Honor, I cannot." Continuing the examination, the referee asked: "You contend that he did not influence you? . . . To color your testimony?" "Yes, he did, in order

to have different testimony," Black answered. "There were several questions that he brought up, and he asked me whether it was so, in regard to the guns, and in regard to how he was dressed and he told me I had to change it around a little bit, in order to get everything clear,—in order to get myself cleared up,—and that is all I can remember at the time,—at this time."

Again the referee endeavored to have the witness particularize and asked him to pick out from his testimony in the transcript anything that Mason requested him to change or color. Black replied: "There is one question in my mind: Mr. Mason told me to identify Marvich,—which I did know Marvich,—and he wanted to know how he was dressed, and he was really dressed in civilian clothing. I don't believe he had any sailor's suit on. I don't recall him having any. . . . At that time, your Honor, they told me he was supposed to have been dressed in sailor's clothing at the time, and he was supposed to have been in a car going back to San Diego in sailor's clothing. He was not in a sailor's outfit . . . but still I testified to that effect,—that he was in a sailor's uniform." The referee then asked: "Is there anything else in there that you can point out, that Mr. Mason directed your attention to, and told you to testify to, one way or the other?" Black answered: "No, your Honor. It has been so muddled in my mind and in my memory, entirely."

Upon cross-examination Black fixed the time when Mason told him to change his testimony as being "after the preliminary." Then when asked if the only false testimony which he gave after the recess in the first trial was in regard to Marvich's dress, he said, "That is one of them. . . . There was so many things I can't recollect everything. . . . I have a very slight memory of all that happened." Then Black was asked: "Would it be fair to say, Mr. Black, that you have no recollection at all at this time." His reply was: "That is right."

Equally evasive were Black's replies to other questions asked him concerning variances in his testimony at different times. For example, "Now, did you ever see me with a gun, Eddie?" Black was asked by Marvich, who is appearing in *propria persona* in the habeas corpus proceeding. "I couldn't tell. Right now, I couldn't tell," Black replied. "Do you remember ever seeing me with a gun,—with the gun in question?" Marvich continued. "The gun in question—I don't think I did," said Black. "I don't remember at the time. It has been so

long ago, your Honor, that I couldn't remember whether he did or whether he didn't."

A. B. Mason, Deputy Sheriff of San Diego County, testified before the referee that in July, 1940, he received an anonymous telephone call. The speaker stated that Marvich, then a parolee from the state prison, was carrying a gun. Mason arrested Marvich, who did not have a gun either on his person or in his automobile. However, Mason placed him in the county jail under a booking of "Hold for State Parole Officer."

Soon afterward Mason discovered that his informant was Black. At Black's suggestion, Mason communicated with the Long Beach police who reported that Marvich was wanted for robbery. According to Mason, Black kept coming to his office with more information about the robbery of the Examiner office, finally involving Meyer Kroll, his step-brother, and giving information leading to the arrest of Gibbons.

During these conversations, said Mason, he asked Black how Marvich was dressed on the day of the robbery. His inquiry was made at the request of the Long Beach officers, based upon the statement of one of the victims that the robber wore a sailor's uniform. Black then stated to him, said Mason, that Kroll had obtained such a uniform for Marvich. Black also told him, Mason continued, that he operated a cleaning establishment from which Kroll had taken the suit.

Referring to a conversation with Black during the first trial of Marvich when Mason, with other witnesses, was excluded from the court room, Mason told the referee that Mrs. Black came to him and said that Eddie had not told the truth. This conversation occurred during a recess. Mason then asked Black, in the presence of his wife, about his testimony. Black then admitted for the first time and contrary to prior denials, that he had gone to Long Beach with Marvich and Kroll on the day of the first robbery. Black also stated that Marvich, while in the automobile at the commencement of the return trip to San Diego, changed from a sailor's uniform into civilian clothes. "I called [Deputy District Attorney] Keeler's attention to it," Mason went on; . . . Black was scared to death, because he said, 'If I testify to that, they will prosecute me.' What Keeler told him in regard to it, I don't know. . . ."

In further testimony before the referee Mason declared that he did not at any time or in any manner tell Black how he was to testify, or suggest any particular thing that he was to say in his testimony. Also, said Mason, he never threatened Black,

nor did he intimate to him that if he did not testify in a particular way, something would happen to him; it was Black's idea, from the time of the first telephone call to get Marvich returned to prison. Moreover, according to Mason, he not only did not promise Black immunity as the reward for his testimony but he urged the Long Beach police to prosecute Black as well as Marvich.

The testimony of Keeler as to what transpired at the time of the recess is that Mason came to him and said, ''Eddie here has been lying like a goat, and he wants to go in there and tell the truth.'' Keeler then told Black, ''We don't want anything but the truth, and nothing but the whole truth,'' and ''If you have been lying up to this time, you better tell the truth from here on out, or it will not go easy for you.'' When the trial was resumed, after further questioning, Black changed his testimony, said Keeler, and told of going to Long Beach with Marvich and Kroll.

Marvich and Gibbons both related to the referee their versions of a conversation with Deputy District Attorney Keeler just after the jury had returned verdicts of conviction. Marvich quoted Keeler as saying that without the testimony of Black he could not have secured a conviction. Also, said Marvich, Keeler agreed to make a favorable report to the Board of Prison Terms and Paroles concerning him if there was no appeal. But Marvich did not testify that there was then any charge by him or admission by Keeler of perjury committed by Black. As Gibbons related the conversation, Marvich told Keeler that they could not have been convicted without Eddie Black's testimony. ''Mr. Keeler says that as long as he had a life term to hold over Eddie Black, he would testify to anything he wanted him to.''

There was a conversation between him and Marvich and Gibbons at the conclusion of the trial, Keeler told the referee. He went to the detention room and asked Gibbons to write him a letter giving some of his background for use in preparing the usual report to be sent to the Board of Prison Terms and Paroles. Marvich came to the door and said, ''What are you going to do for me?'' ''Nothing,'' Keeler said was his reply. There was some further conversation there relative to the claimed perjury of Black, Keeler told the referee, and the attorney stated that according to his recollection of the occurrence he said to Marvich. ''I didn't like to use witnesses like

Eddie Black." But Keeler denied telling Marvich that he had been convicted on perjured testimony.

Other testimony presented to the referee, with the possible exception of that of Mrs. Josie Kroll, is entirely irrelevant to the charges of perjury made by Marvich. Mrs. Kroll, the mother of Black and Meyer Kroll, died after Marvich was convicted. At the second trial she testified that Black, Gibbons and Marvich stayed overnight at her home in Long Beach, just prior to the second robbery, which occurred on June 30, 1940. However, she admitted that shortly before the trial she had made a different statement to Officer Kirkpatrick at the Long Beach police station. According to her testimony, when Marvich, who was then in custody was pointed out to her, she told the officer that she had never seen him before.

Marvich contends that Mrs. Kroll testified falsely in an effort to help Meyer Kroll, her youngest son. The transcript of the several trials shows that the son related to the jury a conversation with his mother concerning her testimony. "In that conversation," counsel for Gibbons asked Kroll, "did you ask her why she had testified at this case and did she state to you that she had been told by some man in the District Attorney's office that he would aid her in getting your term shortened with the Parole Board?" In reply, Kroll did not quote his mother's answer directly but said: "Well, it might not have been the same words but it was something. . . . I surmise that it was something like that." This evidence went before the jury with the testimony of Black who declared that he, with Marvich and Gibbons, about June 23d drove to his mother's home in Long Beach and stayed overnight. Black's statements concerning this visit were not referred to at the referee's hearing and stand unchallenged.

Donald Waters, who at the preliminary examination and at each trial of Marvich identified the petitioner as the person who committed the second robbery, was examined before the referee concerning certain discrepancies in his testimony. Although the petition of Marvich specifically charges that perjury was committed by Black and makes no complaint as to the testimony of any other witness, Waters' attention was called to his varying descriptions of the robber. At the first trial, the transcripts show, Waters said that Marvich was bareheaded and did not wear dark glasses. On the second hearing of the case, Waters said that he thought that Marvich wore a hat. Before the referee Waters declared that his last testi-

mony was true to the best of his knowledge at the time. "Did any one approach you or try to influence your testimony regarding the matter of the hat, or other identification?" the referee asked. "No, sir. No one did," was the reply.

Another witness called by Marvich was Allen Moore, a parole officer. At the second trial, Marvich laid great stress upon the fact that a parole report for the month of March, 1940, assertedly made by him and sent to the State Parole Officer, was not on file. Moore told the referee that he did not appear as a witness at the second trial and was not then a parole officer. According to his testimony he knew nothing as to the reports made by Marvich other than was disclosed by the file.

Walter C. Reid, called as a witness for the petitioner at the referee's hearing, also testified at the second trial of Marvich. According to the transcript of the former proceeding, he told the jury that in April, 1940, Marvich made a down payment on an automobile which he registered in the name of his wife and that Mrs. Marvich turned back the car the following June. Marvich claims that the car was returned a month or two later. Reid stated to the referee that his testimony was correct and that no one had ever asked him to testify in any particular way.

Upon this evidence, the referee made extensive findings of fact. He found that the testimony of several of the witnesses "threw no light" upon the questions submitted to him, but he made particular reference to the testimony of Black, Waters, Mason and Mrs. Kroll. Because Black's memory "was so befuddled and confused," the referee reported, about the only positive testimony procured from him was the bald statement that "on several occasions" Mason asked him to change his testimony "or else."

Black's present testimony is that prior to the robbery Marvich was dressed in civilian clothes. The variance relied upon to support the charge of perjury, the findings state, concerns the statement at one time made by Black that he saw Marvich take off a sailor's uniform. Upon this point the referee summarized the evidence as follows: "There are no supporting facts or testimony except Witness Black's own admission. At the trial Petitioner Marvich took the witness stand in his own behalf but did not specifically deny the incident of taking off of the sailor's uniform as related by Black, nor was he asked regarding the same; Captain A. B. Mason testified that Black

told him Marvich was dressed in a sailor's uniform; and there is other positive corroborating circumstances in support of Black's testimony at the trial to the effect that Petitioner was seen taking off the sailor's uniform, to-wit; Witness Slocum positively identified Marvich, the Petitioner, as one of the robbers on that occasion, and testified that the latter was dressed in a sailor's uniform at that time. Slocum gave the same testimony at the first trial.'' In conclusion, after characterizing Black's testimony before him as ''wholly and completely vague and indefinite,'' the referee declared that it ''cannot be used as a basis for any charge of perjury against any witness connected with the case.''

Considering the testimony of Captain Mason, the only alleged perjury attributed to him, the referee reported, relates to the reason given Marvich for placing him under arrest. Summarizing the evidence, it was the finding of the referee ''that Witness Mason testified at the preliminary hearing and at each trial that Petitioner was being investigated in connection with robbery and no particular robbery was referred to. What he told Petitioner at the time of his arrest, with reference to the charge, or the booking, is immaterial. . . . Whatever the booking was for is of no consequence here, if no perjured testimony or framing of a robbery charge took place, and the Referee finds that there was no perjury, coercion, framing or coaching in connection with any witness who testified at the trial wherein Petitioner was convicted of robbery.''

In regard to the testimony of Donald Waters, the referee found that the only variance in it was as to whether Marvich did or did not wear a hat at the time of the commission of the robbery. Marvich was positively identified as the robber and the uncertainty of Waters upon this point was before the jurors. ''They found against the petitioner,'' said the referee, ''and so it must be held.'' He also reported that nothing which had been submitted to him shows the commission of perjury by Mrs. Kroll.

The conclusion of the referee is ''that no witness at the trial [of Marvich] . . . committed perjury as defined in Section 118 of the Penal Code of the State of California, and that no witness testified to any material matter which 'he knew to be false.' No perjury being found, it naturally follows that no representative of the State of California, the District Attorney, or any of his deputies or assistants, caused or suffered any perjured testimony to be introduced knowing that such testimony as given was perjured.''

Marvich filed "Objections to and Motion to Strike the Referee's Findings of Fact from the Record." First, he attacks a recital by the referee that a subpoena was issued for each person named by the petitioner with the exception of "such witnesses as Petitioner eventually admitted to be unnecessary." Upon that point, the record shows that Marvich requested subpoenas for 18 persons. Black, Mason, Moore, Reid, Waters and Judge Leslie Still appeared and testified. It appears that E. C. Thompson and Mrs. Josie Kroll were dead. In a discussion concerning the attendance of court reporters D. A. Little and Mrs. Lola Stanley, Marvich stated that they "would not throw any light on the issue of perjury." As to Judge Dockweiler, petitioner himself said, "I think we could eliminate him."

Although Marvich did not expressly state that Judge Downs of the Municipal Court need not appear as a witness, the petitioner made no objection to the ruling of the referee that he did not "see any point in bringing Judge Downs or Judge Dockweiler into the hearing." Judge Downs conducted the preliminary examinations of Marvich and Judge Dockweiler presided at the trial which resulted in a disagreement of the jury. The transcript of each of these proceedings was before the referee and Marvich does not contend that either judge could have testified to any fact not shown by the records.

Of the other persons for whom Marvich requested subpoenas, the record shows that Grove, Whitmer, Denning, Kirkpatrick and Shields were all in the Armed Forces and unavailable for service of process. Police Inspector Hall was with the Federal Bureau of Investigation and assigned to duty in Florida. The referee offered to issue a subpoena for him but later stated that he would be eliminated. Petitioner made no objection to that ruling.

It therefore appears that every person for whose attendance Marvich requested a subpoena and who could be served with process in this state either testified before the referee or was not called as a witness pursuant to a ruling either acquiesced in or not objected to by the petitioner. As to the others, Marvich did not state what he expected to prove by any one of them nor did he request leave to take their depositions. Furthermore, at the conclusion of the hearing he stated to the referee that he had nothing further to offer. Under these circumstances there was no restriction of his right to present evidence upon the issues of fact before the referee.

A second ground stated by the petitioner as justifying his objections and motion is that he has proved the allegations of his petition by a preponderance of the evidence and beyond a reasonable doubt. According to his analysis of the evidence, Black, Waters, Mason and Mrs. Kroll falsely testified to material matters in the trial which resulted in his conviction, and Mason, Police Officer Kirkpatrick and Harry Keeler, the Deputy District Attorney conducting the prosecution, were well aware of the perjury committed by these witnesses. The petitioner's contentions in this connection concern the merits of his case and will be considered as exceptions to the findings of the referee.

In his brief, Marvich quotes or refers to testimony which, he insists, supports the charges of his petition. Generally speaking, his arguments rest upon the premise that the conflicts in the mass of evidence which the referee considered should be resolved in his favor. Black changed his testimony during the first trial of Marvich and his story at the second trial was so unsatisfactory that Judge Still, out of the presence of the jury, remarked: "Eddie Black probably committed perjury at this trial." But the uncertainty in the evidence which was recognized by the trial judge was resolved by the jury, as it had a right to do, against the petitioner. And although this court is not bound by the findings of fact made by the referee (see, *In re Mooney,* 10 Cal.2d 1, at p. 17 [73 P.2d 554]), his conclusions are entitled to consideration for the reason that he had the opportunity to observe the demeanor of the witnesses and to weigh their testimony during the progress of examination and cross-examination. The referee has called attention to conflicts and discrepancies in the evidence presented to him as well as that shown in the transcripts of the prior proceedings. But from all of this evidence, it may not be said with certainty that Black committed perjury.

As to the testimony of the other persons who testified for the State, Marvich relies upon variances which are of much less significance than those in the various accounts given by Black. Many of the differences in testimony stressed by the petitioner relate to immaterial matters; each of them is entirely consistent with failure of recollection or innocent misrecollection which are common traits of human experience. And although the petitioner insists that the testimony of Mason, Kirkpatrick and Deputy District Attorney Keeler conclusively shows that they forced Black to commit perjury in

order to secure a conviction, the evidence falls far short of proof of that charge. The fact that Mason placed Marvich in jail under a booking of "Hold for Parole Officer" while investigating the charge of robbery is immaterial. Also, even if Black's testimony concerning the robbery amounted to a confession, there was no objection to it upon the ground that it was not freely and voluntarily given and the evidence relied upon by Marvich to prove that Black committed perjury in order to save himself from prosecution is directly contradicted by other evidence.

Marvich asserts that he was unable properly to prepare his case because the referee failed to comply with his several requests for a transcript of the evidence at the first trial until the hearings were almost completed. But the State was not obliged to provide him with such a transcript, and after one was loaned to him, as a matter of courtesy, he made no request for a continuance nor did he ask that any witness be recalled for further examination.

In the return to the writ of habeas corpus, it is alleged that Marvich is confined in Folsom Prison in accordance with the provisions of two judgments of conviction which are pleaded in *haec verba*. By a "Reply to the Answer and Return" and in a brief, Marvich asserts that those documents are not true copies of the judgments which were rendered by the court following his second trial upon the two robbery charges. He asserts that, in each of the informations filed against him, the prior conviction of a felony was alleged but that, upon arraignment, he denied the accusations. The judgments entered and considered by the District Court of Appeal, and upon which he was received by the Warden of the State Prison, says Marvich, do not include the finding of a prior conviction of a felony. The petitioner explains the situation in this regard as follows: After the decision of the District Court of Appeal which, in affirming the judgments mentioned a prior conviction (*People* v. *Marvich,* 44 Cal.App.2d 858 [113 P.2d 223]), and some ten months after the trial, each of the judgments was corrected *nunc pro tunc* to include the determination of the prior conviction of a felony as charged in the information. Marvich asserts that he received no notice of the order made after judgment. For that reason, he says, he was deprived of the right to appeal from the order and his terms of imprisonment have been fixed upon the judgments as corrected. Although this and other points presented in the "reply" and the

brief have nothing to do with the charge in the petition for the writ of habeas corpus that Marvich was convicted upon perjured testimony, as he is appearing in propria persona each of his contentions will be considered.

Considering the complaint of Marvich that his terms of imprisonment should have been fixed under the judgments as originally entered, the record shows that each of the informations in which Marvich was accused of robbery alleges that, before the commission of the offense then charged, "in the Superior Court of the State of California, in and for the County of San Joaquin, [Marvich was] convicted of the crime of Robbery, First Degree, a felony, and the judgment of said Court against said defendant, in said connection, was, on or about the 4th day of December, 1934, pronounced and rendered, and said defendant served a term of imprisonment therefor in the State Prison." Both of the judgments rendered at the time of the trial recite the conviction of Marvich upon the charge of robbery of the first degree and declare that, as punishment therefor, he should be imprisoned "in the State prison of the State of California at Folsom for the term prescribed by law, which sentence is ordered to run concurrently with his unexpired sentence on the Prior Conviction." Accordingly, it affirmatively appears, not only was the prior conviction of Marvich and his imprisonment therefor adequately pleaded in the informations, but the judgments as originally rendered, ordered that his sentences upon the charge of robbery "run concurrently with his unexpired sentence on the Prior Conviction." And although the court's minutes show that upon arraignment, Marvich denied the charges concerning the prior conviction, at the second trial, when testifying in his own behalf, he admitted that he had served a term of imprisonment following his conviction and was on parole from San Quentin prison at the time of his arrest by Mason.

The record here is therefore much more explicit than the one which was before the court in the case of *In re Basuino,* 22 Cal.2d 247 [138 P.2d 297]. According to certain documents set out in the return to the writ of habeas corpus, Basuino was in court when an information was presented which charged him with a violation of the State Narcotic Act "and one prior conviction of a Felony." Although these documents also showed his admission of the prior conviction and his plea of guilty to the information, the judgment rendered recited only a conviction "of the crime of Felony, to-wit: Violating the State Narcotic Act." However, it was held that the accompany-

ing record might be considered as supplementing the language of the judgment and imprisonment "for the term prescribed by law upon the record of the facts was necessarily implied." In connection with this conclusion, the cases of *People* v. *Noland*, 30 Cal.App.2d 386 [86 P.2d 363], and *People* v. *Schneider*, 36 Cal.App.2d 292 [98 P.2d 215], relied upon by Marvich, were distinguished with the added comment that any contrary conclusion which might be drawn from the language of the opinions in those cases was disapproved. The later decision of *In re Schneider*, 23 Cal.2d 427 [144 P.2d 329], also cited by Marvich, is not in point because the holding there made was based upon the doctrine of the law of the case.

Marvich does not claim that the omission from the judgments of a specific finding concerning his prior conviction has prejudiced him in any way; his complaint is that lack of notice of the order correcting the judgment *nunc pro tunc* deprived him of the opportunity to appeal from it. But applying the rule of the Basuino case to the Marvich record, the charge of the prior conviction in each of the informations and the petitioner's admission of that fact under oath upon the witness stand may be considered as supplementing the language of the judgments which ordered the sentences then imposed "to run concurrently with his unexpired sentence upon the prior conviction" and justified the terms of imprisonment which have been fixed by the Board of Prison Terms and Paroles. The corrected judgments, therefore, did not authorize any punishment different from that imposed by the judgments as originally rendered.

Also, the maximum term of imprisonment which may be imposed as a sentence for the crime of robbery of the first degree is not five years, as the petitioner contends, but is a life sentence, until and unless the board charged with the duty of fixing prison terms, determines that it should be for a lesser period of time. (*People* v. *McNabb*, 3 Cal.2d 441 [45 P.2d 334].) The decision of *In re Quinn*, 25 Cal.2d 799 [154 P.2d 875], followed this construction of the statute but held that because a life sentence may be reduced to a specified number of years, a trial court may direct whether multiple sentences shall run consecutively or concurrently.

The writ is discharged and the petitioner is remanded to the custody of the Warden of the State Prison at Folsom.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.