[Crim. No. 73.   Fifth Dist.   Aug. 9, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM
ANDREW HOUSTON, Defendant and Appellant.

Richard T. Tosaw, under appointment by the District Court of Appeal, and Collier & Tosaw for Defendant and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Edward A. Hinz, Jr., Deputy Attorney General, for Plaintiff and Respondent.

CONLEY, P. J.—William Andrew Houston was found guilty by a jury of armed robbery and kidnaping. Although the defendant admits that he has been convicted of 15 other armed robberies, he contends that the jury was mistaken this time.

The appellant took the stand in his own behalf and denied that he had committed the offenses charged; this defense was bolstered by written documents and the testimony of witnesses from southern California which showed that the defendant was in the Los Angeles area earlier on the day of the robbery and that if he drove his truck back toward Modesto prior to the crime, he would scarcely have had time to accomplish the transit to the northern town. However, there were gaps in this testimony and the jury could legitimately have found, as it did, that the evidence did not give rise to a reasonable doubt as to the guilt of the defendant.

There is no contention on the appeal that the record is not technically sufficient to justify the verdict from the standpoint of an appellate court. The sole basis of the claim for a reversal of the judgment is that the trial court erred in permitting evidence of one of defendant's 15 admitted robberies on the theory that it showed a plan, scheme or method of operation tending to prove identity in confirmation of the positive identification made by the victim and another witness.

Robert Joseph Galligher testified that he was the grocery store manager of Safeway Stores, Inc., at the corporation's

place of business at Orangeburg and McHenry Avenues in Modesto; he had worked for the company for 11 years, 7 of them being at the same Modesto store. On Friday, September 8, 1961, he and Bill Hildreth, a clerk, made up a stacking crew which was scheduled to work until midnight. At 9 o'clock Galligher locked the doors, as was the custom; usually, all the clerks stayed in front until the money was put away, then the store was locked and everyone left together. But on this particular Friday night, since the two men were to stay until 12 o'clock everybody else was let out, and then Galligher locked the doors; Hildreth went to the back of the store and began stacking shelves.

Galligher took the money from the five cash registers into the safe room and put it in the safe for the night; he locked the safe and closed it, turned the dial and checked to make sure it was locked; he closed the access door to the room where the safe is kept, tested it to see that it was locked and went upstairs to the men's restroom.

When Galligher opened the door he saw a stranger standing in front of him dressed like a clerk; he was wearing a white shirt and a red or light maroon tie and had his shirt sleeves buttoned down around his wrists; he wore a grocery clerk's apron; he came toward Galligher carrying a gun about waist-high and said, "Don't move or you've had it," or "I'll kill you." The witness did not remember the exact words but knew they were enough to warn him of what he must do. The man took Galligher by the shoulder, turned him around and thrust the pistol in his side; at this time they were standing in the center of the locker room; the stranger asked Galligher questions about the store, told him he had better tell the truth or he would be dead, and inquired how many people were on the premises.

The two men walked down the stairs, and Galligher unlocked the door to the safe room and opened the safe; Galligher stood to the right of the safe, by the door; the robber brought out a paper sack, a regular-sized, 16- to 20-pound grocery bag. Galligher held the sack while the man held the gun and reached in the safe with his left hand and took all the currency, which consisted of bundles of one-dollar bills and five-dollar bills. The stranger asked where the "big money" was, and Galligher said there wasn't any, because the manager made a night deposit each night and got rid of it all. The man said that he knew better and that he knew more about the stores than Galligher did, but the latter said,

"No," it was all in the bank. At that time the store manager, seeing that the robber did not believe him, reached into the safe above the door on the inside where some extra money was kept and gave this to him. The intruder asked, "Is that all?" and Galligher answered that it was. The sum of $2,300 was taken from the safe. The man seemed to be satisfied, and the two left the safe room. The robber, holding the gun, walked behind Galligher, who was still carrying the bag with the money in it; the two could hear the noise made by Hildreth working in the rear of the store; they walked toward the entrance and stopped momentarily at the door; the robber instructed Galligher if anyone met them to say he was just another clerk from one of the other stores. They walked out the entrance door, across the parking lot and down Orangeburg Avenue about a half block; the stranger then asked Galligher where his car was parked; he replied that it was back on the lot; they turned around and started in the direction of the parking lot. When they reached the automobile, a 1951 Studebaker, the man asked for the keys, instructed Galligher to get in, got behind the wheel and started the car. Galligher was still holding the money; the man was still pointing the gun at him.

The car was driven east on Orangeburg Avenue to Coffee Road, where a left turn was made, and then the vehicle was headed into the country. The driver asked questions repeatedly as to directions, towns, roads, irrigation ditches and said that he must find a place to leave Galligher so he wouldn't be found immediately. The robber drove the car very fast up and down the country roads, but finally stopped the vehicle and told Galligher to leave the sack of money on the seat and get out. The two men walked across the road; the robber told the store manager he would be all right if he would do as he was told; he directed him to put his hands behind him, and, taking a plastic-coated wire out of his back pocket, the robber tied his hands together very tightly and told him to lie down on the ground in the grass, as some lights were coming; the stranger went back to the car but did not leave, waiting until the other vehicle passed on the crossroad, then got out of the automobile again, came across the road, tied Galligher's feet and hands together, pushed him into the ditch and threw weeds around him. He ran to the car, slammed the door and drove away. The witness testified that he broke loose quickly and ran down the road toward a farm house; a driver of a pickup truck

stopped for him and took him to the Riverbank police; Galligher was uninjured.

At the trial Mr. Galligher positively identified the defendant as the robber. The witness said the man who committed the crimes had a very thin mustache, such as might be grown in two or three weeks, had his hair combed plastered to his head, and had a very pale face and a soft voice.

Bill Hildreth testified that he had seen a man standing in front of the number one checking stand while the store was open at about 8 o'clock that evening; Hildreth thought he looked "kind of funny"; the man said nothing; Hildreth nodded to him; the man did not answer; he didn't have a wheeled basket with him. On cross-examination the witness testified that the man was wearing a brown jacket and that the jacket was not afterwards found in the store. Hildreth identified the man standing by the checking counter as the defendant.

Robert Miller, a Deputy Sheriff of Contra Costa County, testified that on a routine patrol on June 13, 1962, he stopped and searched a car in which the defendant was riding and found a .38-caliber revolver in the glove compartment, the gun being fully loaded. The defendant at that time admitted that it was his weapon, and the pistol was received in evidence. Mr. Galligher testified that this was the same gun that was used in the robbery, or one that clearly resembled it.

We shall not survey in detail the defense evidence of the alleged alibi; it was not accepted by the jury as raising a reasonable doubt as to the presence of the defendant at the scene of the robbery and kidnaping, and it is not contended on appeal that the evidence established an alibi as a matter of law.

Burdette Bushman testified that he was a store manager for the Safeway Store in the town of Rheem, located between Orinda and Lafayette in Contra Costa County; that he had worked for the Safeway Stores about 14 years; that on March 30, 1962, at 10:30 in the morning defendant walked in the side door of the store. Three or four minutes before, an armored car had delivered the change fund for the day; this money had been put in a safe located near the front of the store. As defendant walked in the side door, Bushman came face to face with him, and somehow the appearance of the defendant seemed very familiar to him; Bushman walked up to him, and, as defendant had his arm in a sling, said, "My gosh, what happened to you?"; defendant pulled back his

sling, showed a pistol and told Bushman to open the safe. The safe was located next to a ''Coke'' machine; defendant stood between the safe and the ''Coke'' machine; Bushman opened the safe; the seal on the change bag had not been broken; defendant pulled a shopping bag from underneath his coat, held it open and said, ''Just drop it in here.'' Then he told Bushman to open the bottom of the safe; Bushman told the defendant that he didn't have keys to this compartment because the armored car carried one key and the other key was in the store. The defendant said, ''I know all about these things,'' and made Bushman take out all his keys and try them; then defendant began to be nervous and said, ''Come on, open it.'' Bushman told defendant that he had cooperated and had done everything the defendant had asked him to do, but he could not open the bottom of the safe. Defendant told him that he believed him, turned around and walked to the back of the store, went out the side door and disappeared. Bushman testified that defendant kept the pistol in the sling the entire time and only pulled the sling back enough to show the gun to Bushman; that defendant was wearing a rust-colored suede jacket and sun tan trousers and was bareheaded; that he wore large horn-rimmed glasses and had a small black mustache about an inch and a quarter long, quite thin. Bushman said that defendant was quiet and soft-spoken. On the day of the crime, Bushman told the police that defendant was between 30 and 35, weighed about 150 pounds, was about 5 feet 10 inches tall, with a very, very ruddy complexion and very black oily hair; the police report did not make mention of a mustache.

▉ Appellant's sole contention, that the court erred in admitting testimony of another crime committed by the defendant to show plan, scheme or *modus operandi*, cannot be sustained. ▉ The mere fact that only one additional crime was thus put in evidence is not a proper ground for rejection; the rule does not require that more than one other similar crime be shown for that purpose. (*People* v. *Peete*, 28 Cal.2d 306 [169 P.2d 924]; *People* v. *Baker*, 183 Cal.App.2d 615 [7 Cal.Rptr. 22].) ▉ And the one other offense may precede or follow the crime for which the defendant is being tried. (*People* v. *Coefield*, 37 Cal.2d 865, 869 [236 P.2d 570].)

▉ The controlling law on this subject is compressed into two sentences in *People* v. *Rosoto*, 58 Cal.2d 304, 330 [23 Cal.Rptr. 779, 373 P.2d 867], where what is said of con-

spiracy would equally apply to robbery: "In a prosecution for conspiracy evidence of other crimes may be received if it tends to show the existence of a common plan or system of the accused. [Citing authorities.]

"The test of admissibility is whether the offense charged and the other offenses exhibit a common *modus operandi*; whether they do so is primarily a question for the trial court."

*People* v. *Mims*, 160 Cal.App.2d 589, 597 [325 P.2d 234], establishes the test as to whether this type of evidence should be admitted: "It is now well settled as an exception to the rule that evidence of other crimes is not admissible, that evidence of similar crimes is admissible to show plan, scheme, system, design or a characteristic behavior pattern of the accused."

In *People* v. *Peete, supra,* 28 Cal.2d 306, 314-315, the court says: "It is settled in this state, however, that except when it shows merely criminal disposition [citing authorities] evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged. 'The general tests of the admissibility of evidence in a criminal case are: . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' "

*People* v. *McCarty*, 164 Cal.App.2d 322, 325-326 [330 P.2d 484], holds: "Since defendant denied the robbery and offered the defense of an alibi, it is obvious that the sole issue determinative of defendant's guilt or innocence was the question of his identity as the robber. In other words, the essential question was whether the prosecution witnesses were mistaken in their identification of the defendant as the perpetrator of the crime with which he was charged. . . . In *People* v. *Peete*, 28 Cal.2d 306, 318 [169 P.2d 924], it was held that evidence of another crime showing a similar *modus operandi* was admissible as tending to identify the defendant as the perpetrator of the crime immediately charged."

(See also *People* v. *Grimes*, 113 Cal.App.2d 365, 371 [248 P.2d 130]; *People* v. *Baker, supra,* 183 Cal.App.2d 615, 622, 623; *People* v. *Roach,* 148 Cal.App.2d 364, 368 [306 P.2d 523]; *People* v. *Lane,* 100 Cal. 379 [34 P. 856]; *People* v. *McCullough,* 158 Cal.App.2d 310 [322 P.2d 289]; *People* v. *Al-*

*bertson,* 23 Cal.2d 550 [145 P.2d 7]; *People* v. *McFarland,* 58 Cal.2d 748 [26 Cal.Rptr. 473, 376 P.2d 449]; Witkin, California Evidence (1958) Circumstantial Evidence, § 138, pp. 161-162.)

The record shows that the question of admissibility of this particular evidence was debated at length by counsel and that the ruling was neither hasty nor inadvertent. The trial court had ample ground upon which to base its decision, in that the two crimes had the following elements of identity or similarity:

1. Armed robbery of a Safeway Store;
2. Entry by the robber while the store was open, i.e., no breaking into the store;
3. The victim was the manager in charge;
4. The criminal was armed with a revolver;
5. He attempted partially to conceal the weapon;
6. He went directly to the safe;
7. The robber took money only from the safe, i.e., not from cash registers or individuals;
8. He supplied his own bag to carry away the proceeds of the robbery;
9. He demanded that the victim not hold back any money;
10. The robber seemed thoroughly familiar with the layout of the store and the customary method of administration;
11. During the robbery the criminal spoke in a soft voice;
12. He wore a thin mustache as a disguise.

This last fact was one of the most significant features of similarity; each of the victims testified that the robber wore a small mustache which apparently was not false, but a growth of the natural beard, it being rather thin in texture and short in length. Mr. Galligher had testified positively that the robber had worn such a mustache. The defendant vigorously denied that he had ever worn one at any time, yet the testimony of Mr. Bushman, the victim of the Orinda robbery, showed that the defendant wore such a mustache at the time he robbed him, and the defendant had admitted, of course, that he was guilty of the Orinda crime. It is true that there were also notable differences in the description of the men who committed the two crimes; perhaps the strongest differences were that the Orinda robber was described as having a "very ruddy" complexion, and that he wore horn-rimmed glasses, while the Modesto robber was said to be "real pale" and wore no glasses. But the trial court has a wide discretion in determining whether a proper foundation for the

admission of such testimony has been laid. (*People* v. *Rosoto, supra,* 58 Cal.2d 304, 330; *People* v. *Grimes, supra,* 113 Cal.App.2d 365, 371.) We find no error in the ruling.

However, as the robbery and the kidnaping after the completion of the robbery constituted one course of conduct, dependent upon a single intent and objective, the defendant has been improperly punished for one of the two crimes under the holding of the Supreme Court in *People* v. *McFarland, supra,* 58 Cal.2d 748, 760. (See also Pen. Code, § 654; *Neal* v. *State of California,* 55 Cal.2d 11, 18 [9 Cal.Rptr. 607, 357 P.2d 839]; *People* v. *Jones,* 211 Cal.App.2d 63, 73-74 [27 Cal.Rptr. 429].)

The punishment for kidnaping for purposes other than securing ransom or extortion or robbery is not less than one nor more than 25 years. (Pen. Code, § 208.) In this case no physical harm was done to the victim, and the kidnaping followed a completed robbery, it not being carried forward for the purpose of ransom, robbery or extortion. Therefore, the greater punishments provided for kidnaping in certain circumstances (Pen. Code, § 209) would not apply. The punishment for robbery in the first degree is imprisonment "for not less than five years," which would make the maximum punishment imprisonment for life. (*In re Marvich,* 27 Cal.2d 503 [165 P.2d 241]; *In re Smith,* 33 Cal.2d 797 [205 P.2d 662].) Therefore, the greater punishment is for armed robbery, rather than for kidnaping.

The judgment is reversed insofar as it imposes a sentence for kidnaping, and in all other respects it is affirmed.

Brown (R.M.), J., and Stone, J., concurred.