[Crim. No. 14717.   Second Dist., Div. Five.   June 23, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. FRED
WEATHERS, Defendant and Appellant.

---

Gerald A. Witt, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Edward J. Horowitz, Deputy Attorney General, for Plaintiff and Respondent.

REPPY, J.—After a trial by jury defendant, Fred Weathers, was convicted of grand theft in violation of section 487, subdivision 1, of the Penal Code. Defendant had previously admitted that three priors alleged in the information were true. After his motion for a new trial was denied, defendant was sentenced to state prison. This appeal is from the judgment of conviction.

On December 29, 1966, the victim, Joseph Anekstein, an 82-year-old retired dressmaker, was approached by a man who introduced himself as a seaman in the merchant marine of a foreign country (hereinafter, "the seaman"). The seaman told Anekstein that he was carrying about $20,000 in cash; that he wanted to deposit it in a bank but his captain had told him that if he put the money in he could not later get it out. Anekstein explained that this was not so and agreed to show the seaman his deposit book and withdraw all the money shown as the balance on deposit in order to prove that deposited money would be returned. The seaman told Anekstein that he would give him up to $2,000 for this proof.

At this point, a bystander was stopped by the seaman and the same story related. The bystander (hereinafter, the "driver") offered to drive Anekstein and the seaman to the bank and advised Anekstein that he should not pass up such a good deal. The trio first stopped at Anekstein's home where he picked up his passbook. Next they drove to the California Savings Bank where Anekstein went in alone and withdrew $1,000 in the form of a check. When Anekstein returned to

the car the seaman said, "I want to see the cash. Otherwise I don't believe." So the trio drove to a branch of Security Bank and Anekstein, again entering alone, cashed the check. The teller placed the large amount of cash in a white envelope and handed it to Anekstein. Anekstein returned to the car where the seaman and driver waited. Anekstein handed the seaman the envelope and the seaman gave Anekstein a brown paper bag which he said contained Anekstein's money and the money he was to be paid. The driver proceeded one block whereupon he stopped, pushed Anekstein out, and drove away with the seaman. Anekstein examined the contents of the bag and found it to contain Kleenex tissues.

Anekstein returned home and called the police. In the evening, Officer Stevens, assigned to the robbery and bunco detail of the Los Angeles Police Department, came to Anekstein's home with approximately 180 pictures, 150 of which were bound in books. Officer Stevens spread out 10 or 15 of the loose "mug shots" on the kitchen table for Anekstein's perusal. Officer Stevens was guided in his selection of the initial set of pictures by the verbal description that Anekstein had given him. Anekstein identified defendant Weathers (hereinafter, defendant) as the driver and Alex Jennings as the seaman. Officer Stevens was familiar with both men's prior activities and arrests. He knew where they could be found.

Following this session with Anekstein, Officer Stevens made a general investigation to locate Jennings and about 11 p.m. on December 30, 1966, arrived at a West 83d Street address. After observing no lights on at the address, Officer Stevens parked down the block and waited. In about five minutes Jennings and a female companion drove up and entered the apartment. Officer Stevens recognized Jennings. Officer Stevens waited until both were inside before he got out of his car, walked into the apartment and arrested Jennings. Officer Stevens did not announce himself before entering the front door which was wide open. A search of Jennings' person and the apartment revealed $121 in cash, a phony bankroll consisting of play money, a United California Bank passbook bearing the name "Alex Jennings" and showing an $800 deposit on December 29, 1966, and also a piece of brown paper bearing the writing "1414 Peagreen Street, Greenville Hotel, Jabbo Brown." A search of Jennings' car in which he and his female companion had arrived, and which was parked immediately outside the apartment, revealed a brown paper sack containing folded newspaper. Also found there was a box of Kleenex tissues.

Officer Stevens next proceeded to defendant's apartment on West 28th Street, he having independent knowledge that defendant was living there. He knocked on the door and defendant's girl friend, Mary, (with whom Officer Stevens also was acquainted) answered from inside, "Who is it?" The officer replied, "[It is] Sergeant Stevens. . . . I have come for Pretty Teddy [defendant's nickname]. Is he here?" Mary answered, "Yeah, just a minute." Within four or five seconds Officer Stevens heard the toilet flush and again called out, "Mary, open the door. We are going to arrest Pretty Teddy." Again Mary said, "Just a minute" and the toilet was flushed again. Officer Stevens called out, "Mary, open the door or I'm going to kick it down." When the door wasn't opened, Officer Stevens did break it down, entered the apartment, found defendant in bed, and immediately placed him under arrest. Officer Stevens then conducted a search of the premises which turned up $113 in cash and a white card on which was written, "Brownville Hotel, . . . 1414 Peagreen Street, Room No. 6, 'Ask for Mary Brown.'"

A consolidated information was filed against both Jennings and defendant. At the trial of this matter, after the jury had been impaneled and sworn, but before any testimony was given, Jennings, out of the presence of the jury, changed his plea to guilty. On their return, the jurors were admonished not to speculate why Jennings was no longer a codefendant.

During the trial, the items found as a result of the searches of both Jennings' and defendant's residences were received in evidence. Further, the prosecution read into the record the testimony of a Samuel Poll taken at a preliminary examination held on December 10, 1962, in the case of People v. Fred Weathers. Poll, in substance, had testified that in Alhambra he was approached by a man (identified by Poll to be Weathers, the present defendant, to be referred to in this context as "No. 1") and was asked where the nearest bank was located. Poll told him. Then "No. 1" asked Poll if Poll could guarantee that the bank would return money deposited therein. At this point, another man (hereinafter, "No. 2") approached and volunteered to drive Poll and "No. 1" to a bank if Poll would give directions. They entered a car which "No. 2" drove, Poll sitting on the passenger side of the front seat, "No. 1" and a third confederate (hereinafter, "No. 3") sitting in the back seat. Poll directed them to a bank but the car stopped short of it and Poll, "No. 2" and "No. 1" alighted. "No. 1" asked Poll for some identification so that he would know Poll was honest. Poll took from his wallet his

social security card. "No. 1" grabbed the wallet and he and "No. 2" fled. Poll assumed that "No. 3" drove the car away.

The testimony was allowed to be read after the trial judge had made a preliminary ruling (1) that the prosecution had used due diligence to secure the presence of Poll, but medical reasons prevented his attendance; (2) that the *modus operandi* shown in the substance of the transcript had sufficient probative value (inferential proof that defendant committed the present theft) to outweigh its prejudicial effect (inference that defendant was habituated to criminal conduct). The trial judge gave a cautionary instruction to the jurors before the transcript was read that its use by them was limited to the first stated purpose. Counsel for defendant made timely objection.

Defendant's major contention is that the trial court committed reversible error in allowing into evidence the transcript of Poll's testimony. We agree and therefore a reversal is required.

The admission of the trancript of Poll's testimony presents two issues: (1) did the prejudicial effect of its admission outweigh any probative force it may have had? (2) even if the reported testimony did qualify as proper *modus operandi* evidence, did its admission, read from a transcript, deprive defendant of his constitutionally protected rights of confrontation and due process of law? It is unnecessary to reach this latter question because the testimony contained in the transcript clearly did not qualify as proper evidence of *modus operandi*.

■ The general rule in this state is that evidence of uncharged crimes is inadmissible in a criminal prosecution (*People* v. *Kelley*, 66 Cal.2d 232, 238-239 [57 Cal.Rptr. 363, 424 P.2d 947 ]; *People* v. *Haston*, 69 Cal.2d 233, 244-245 [70 Cal.Rptr. 419, 444 P.2d 91]) *unless* is has *sufficient relevance* to a material fact in issue in the current prosecution. (*People* v. *Peete*, 28 Cal.2d 306, 314-315 [169 P.2d 924]; *People* v. *Riser*, 47 Cal.2d 566, 578 [305 P.2d 1].)

California's definition of "relevance" is embodied in section 210 of the Evidence Code: " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." ■ It is apparent that there is some relevance in the proof of prior or subsequent criminal acts of a nature comparable to the charged offense. But facts

whose relevance are outweighed by their prejudicial effect should not be admitted into evidence. (See Evid. Code, § 352, subd. (b).) This concept was well set out in a law review article recently cited by our Supreme Court in *People* v. *Haston, supra,* at p. 246: "Experience in our society tends to show that many criminals repeat their crimes. When a criminal has committed several similar thefts, experience and logic indicate that he has a criminal propensity or disposition to commit theft. From this premise, it can logically be inferred that he *might* be guilty of *any* subsequent similar theft. However, because it is at least equally probable, and perhaps, in some cases, more probable that this thief did not commit the particular subsequent theft, the evidence of his recidivistic tendencies, although logically relevant, is excluded. The degree of relevancy is not sufficiently high in terms of the inconsistent alternative inferences [and the resultant danger of prejudice]."[1]

In the instant case the single issue of fact, upon which both the prosecution and defense focused, was whether defendant was the accomplice of Jennings. Thus, the relevance of Poll's testimony hinged on whether it helped establish the identity of defendant as the accomplice.

To be helpful in establishing identity, the methods used in both crimes must be so similar that it is logical to conclude that the crimes were committed by the same person. This similarity must be shown in terms of unique and distinctive *features* or *techniques*[2] *exhibited by the perpetrator of the* crimes. (*People* v. *Haston, supra,* at pp. 246-251; *People* v. *Cavanaugh,* 69 Cal.2d 262, 273 [70 Cal.Rptr. 438, 444 P.2d 110].) It is *not sufficient* to show that the crimes were both of the same type, e.g., both were robberies or both were rapes.

In the instant case many dissimilarities in the commission of the two offenses negate the existence of sufficient distinctive or common features. Principal among these are: (1) if defendant were both times a participant, in each he played a different role; (2) the scheme was accomplished by two men in the instant case and three men in the prior matter; (3) while in both cases the initial story told to the victim was similar, the victim in the instant case was fleeced of his money after he had gone to the bank to make a withdrawal,

[1]Comment, "*A Proposed Analytical Method for the Determination of the Admissibility of Evidence of Other Offenses in California,*" 7 U.C.L.A. L.Rev. 463, 474-475.

[2]2 Wigmore, Evidence (3d ed. 1940) § 411, pp. 385-386.

while in the prior case, the victim's money was taken before the bank was reached; (4) the taking of money in the current operation was accomplished by trick (the "switch") while in the earlier case Poll's money was taken by force; (5) there was no evidence introduced that either of the two accomplices in the theft of Poll (referred to *supra* as "No. 2" and "No. 3") was Jennings. (See *People* v. *Haston, supra,* at pp. 249-250.)

Further, those common features which appear to be distinctive (e.g., the initial story told to the victim, the approach of the "driver" and his encouragement of the victim, etc.) lose this quality when it is considered that all who commit this type of scheme usually follow approximately the same script and use similar props.[3] (*People* v. *Haston, supra,* at p. 248; *People* v. *Fleig,* 253 Cal.App.2d 634, 639-640 [61 Cal.Rptr. 397]; *People* v. *Pell,* 258 Cal.App.2d 379, 382 [65 Cal.Rptr. 603]. Cf. *People* v. *Peete, supra,* 28 Cal.2d 306, 318; *People* v. *Adamson,* 225 Cal.App.2d 74, 77-78 [36 Cal.Rptr. 894]; *People* v. *Houston,* 219 Cal.App.2d 187, 194 [33 Cal.Rptr. 26]; *People* v. *Scott,* 218 Cal.App.2d 249, 254 [32 Cal.Rptr. 225]; *People* v. *McCarty,* 164 Cal.App.2d 322, 326-327 [330 P.2d 484].) This fact was brought to the trial court's attention by Officer Stevens. He had been investigating bunco cases for 20 years. In light of this experience he testified that the paraphernalia found at Jennings' residence (the phony bankroll, Peagreen Street address and box of Kleenex tissues) were used by "almost all Jamaican Switch suspects during their operation."

The error in the admission of the *modus operandi* evidence resulted in prejudice particularly since defendant presented alibi evidence in the form of the testimony of Jennings to the effect that defendant was not his driver accomplice but another, one Henry Jones, was, and of the testimony of a friend to the effect that defendant was with him elsewhere at the time the episode with Anekstein was alleged to have taken place. (See *People* v. *Pell, supra,* 258 Cal.App.2d 379, 384; *People* v. *Briggs,* 58 Cal.2d 385, 407 [24 Cal.Rptr. 417, 374 P.2d 257].) Thus, it is reasonably probable that a result more favorable to defendant would have been reached had Poll's testimony not been admitted.

Since the judgment must be reversed, we briefly consider three problems which may arise on retrial.

---

[3]In the words of the deputy district attorney at trial: "This isn't just another theft; this is a rather specialized type of theft."

1. Was the entrance by Officer Stevens into Jennings' apartment made in violation of Penal Code section 844? Whether entry through an *open door* without announcement of identity and purpose constitutes a violation of section 844 is still an open question in this state. (But cf. *Sabbath* v. *United States*, 391 U.S. 585, 590 [20 L.Ed.2d 828, 834, 88 S.Ct. 1755]; *Keiningham* v. *United States* (D.C. Cir.) 287 F.2d 126, 130 [109 App.D.C. 272].) There are two Court of Appeal decisions which take opposite positions on this issue. (*People* v. *Bradley*[4] (Cal.App.) 70 Cal.Rptr. 339 and *People* v. *Beamon*, 268 Cal.App.2d 61 [73 Cal.Rptr. 604].)

2. Was the entrance by Officer Stevens into defendant's apartment made in violation of Penal Code section 844? *No.* Officer Stevens had reasonable cause to believe defendant was inside and that he had committed a felony. Officer Stevens further fully complied with section 844 before he forced entry. (*People* v. *Harris*, 231 Cal.App.2d 214, 217 [41 Cal. Rptr. 642].)

3. Did Officer Stevens' method of presentation of mug shots to Anekstein constitute an unfair lineup procedure, violative of defendant's right to due process of law? *No.* Clearly the problems contemplated in *United States* v. *Wade*, 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926] and *Gilbert* v. *California*, 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951] are not present here as no one was in custody when the identification was made. Further, there was no evidence of any unfairness in Officer Stevens' presentation.

The judgment is reversed.

Kaus, P. J., and Stephens, J., concurred.

---

[4]In *Bradley* a hearing before our State Supreme Court has been granted and oral argument has taken place.