[Crim. No. 11710. In Bank. Aug. 19, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. ODELL CLARENCE HASTON, Defendant and Appellant.

Marks & Schneider, Gerald J. Levie, Thomas W. Sneddon, Jr., Burton Marks and Harvey A. Schneider for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

SULLIVAN, J.—Defendant was charged by information with three counts of robbery (Pen. Code, § 211)[1] (counts 1, 3 and 5), three counts of kidnaping for the purpoose of robbery (§ 209) (counts 2, 4, and 6), and a prior felony conviction. He pleaded not guilty and admitted the prior conviction. A jury found him guilty as charged and determined (§ 1157) that the robberies were of the first degree (§ 211a). As to counts 2, 4, and 6, defendant was sentenced to the state prison for the term prescribed by law, such sentences to run concurrently with each other and with any other sentence to which he might be subject. As to counts 1, 3, and 5 defendant was also sentenced to the state prison for the term prescribed by law, such sentences to run concurrently with each other. Execution of sentence as to counts 1, 3, and 5 was suspended pending appeal and the serving of sentence as to counts 2, 4, and 6—such suspension to become permanent upon completion of the sentences as to said counts 2, 4, and 6.[2] Defendant appeals from the judgment.[3]

---

[1]Unless otherwise indicated, all section references hereafter are to the Penal Code.

[2]The minutes of the court at the time of imposition of sentence omit reference to the suspension of execution on counts 1, 3, and 5; however, a corrected minute order entered later reflects such suspension of execution.

[3]Defendant also purports to appeal from the order denying his motion for new trial. That order being nonappealable (§ 1237, subd. 2; *People*

On November 28, 1964, the J. C. Penney Co. store in Torrance was robbed of some $40,000. The robbery was accomplished by two armed and masked men who entered the store shortly after closing time by an exit door through which employees were departing. They herded the remaining employees into the cashier's office, ordered some to lie face down on the floor, forced others to assist in gathering the currency, fled with a hostage subsequently released unharmed, and eventually made their getaway with the money.

On January 30, 1965, the same store was robbed of some $25,000, again by two armed and masked men. This robbery took place in the early morning, before the store was opened, the robbers gaining entry by accosting three custodial employees in the parking lot and forcing them to open the door with a key. They then took the custodial employees to a lounge near the cashier's office where all of them waited for more than two hours until other employees began to arrive. One of the new arrivals was made to open the safe, and two others were required to assist the robbers put currency from the safe into shopping bags. The robbers fled prior to the opening time.

On April 24, 1965, the May Company store in Lakewood was robbed of some $100,000, again by two armed and masked men. After the store had closed for business and the clerks were engaged in checking their receipts and turning them in to the cashier, one of the robbers appeared at the cashier's office, informed employees there that a holdup was in progress, and demanded admission to the office. After being admitted they proceeded, with the enforced help of employees, to fill shopping bags with currency from the vault. Then, closing the vault, they took the employees to another floor, forced them to lie down, and fled.

Charges were brought against defendant Haston and one Donald McDowell. The latter, however, pleaded guilty to three counts of robbery,[4] and only defendant was brought to trial.

The primary issue at trial was that of identification. The prosecution produced employees from each of the robbed stores and elicited from them identification testimony based

---

v. *Lessard* (1962) 58 Cal.2d 447, 450 [25 Cal.Rptr. 78, 375 P.2d 46]), the attempted appeal therefrom must be dismissed.

[4]The record does not disclose whether McDowell was also charged with kidnaping for the purpose of robbery. If he was so charged, apparently the kidnaping counts were dismissed when he entered his plea as to the three robbery counts.

upon their recognition of defendant in a police lineup. Then, ostensibly for the purpose of showing identity through a common *modus operandi*, the prosecution introduced, over objection, evidence of two restaurant robberies perpetrated by defendant and McDowell in 1962. This evidence included defendant's extrajudicial confession to those robberies. The prosecution also introduced evidence to the effect that defendant, although unemployed at the time, had spent sums of money aggregating over $15,000 during the period between the charged robberies and his apprehension therefor.

Defendant, testifying in his own behalf, admitted his participation with McDowell in some 10 to 15 robberies in 1962, including the two restaurant robberies proved by the prosecution. However, he denied his complicity in the crimes charged and sought to establish an alibi. His wife and her cousin gave testimony in support of his alibi. Defendant also admitted that he had spent some $18,000 during the period between the May Company robbery and his arrest, but he represented that the money was the result of the 1962 robberies.

Donald McDowell testified for the defense to the effect that one Duke Edwards, who bore some physical resemblance to defendant, had assisted him in the robberies charged against defendant.

## I. *Evidence of other offenses.*

As indicated above, evidence of certain prior offenses was introduced for the alleged purpose of identifying defendant as one of the perpetrators of the charged crimes by showing a distinctive *modus operandi*.[5] It consisted of (1) evidence given by witnesses to such crimes, (2) defendant's extrajudicial confession to such crimes, and (3) evidence that defendant had pleaded guilty to one of such crimes.

### (1) *Evidence of witnesses to prior crimes.*

Jacqueline Wininger testified that on November 11, 1962,

---

[5]Prior to the taking of testimony the prosecutor, out of the presence of the jury, made an offer of proof wherein he set forth certain similarities between the prior crimes and the charged crimes. Over defendant's strenuous objection the court determined that the combination of common factors enumerated by the prosecution was sufficient to justify admission of the evidence for the limited purpose indicated, and that such evidence should be presented to the jury subject to a motion for new trial [*sic*— motion to strike?] in the event that the prosecution failed to demonstrate the existence of the common factors upon which it relied. The evidence summarized below was accordingly presented.

Although the presentation of the indicated evidence was not preceded by a cautionary instruction as to the purpose for which it was being received, the jury was instructed as to that limited purpose during final instructions in the general terms of CALJIC No. 33.

she was employed at Clancey's All-American, a drive-in restaurant near Torrance; that on that night shortly after the drive-in had closed for business, while she and two other employees were cleaning up and preparing to leave one of said employees, upon returning from emptying the trash outside, forgot to lock the door; that soon afterward a masked man with a gun appeared and ordered her to go to the stockroom and open the safe; that she noticed another masked man standing over the other two employees, who were lying on the floor; that after she had opened the safe, and the first man had taken some $1,300 therefrom, she was ordered to lie down on the floor with the other employees; and that the intruders then fled.

Samuel Meek testified that on November 26, 1962, he was manager of the McDonald's drive-in restaurant in Torrance; that at about midnight on that date, after the restaurant had been closed for business approximately one hour, he and three other employees were preparing to leave for home; that one of the other employees, intending to throw out some trash, started to go out through a rear door but was pushed back into the restaurant by a masked man with a gun; that the man ordered Meek to get down on the floor and threatened to kill him unless he opened the safe; that a second armed and masked man held the other employees at bay while the first man roughly forced Meek to open the safe; and that the robbers took some $2,400 and fled. Meek's testimony was corroborated by that of another employee.

(2) *Evidence of defendant's extrajudicial confession to prior crimes.*

Defendant's confession to the Clancey's and McDonald's robberies was introduced through the testimony of Sergeant Robert Kinsey of the Los Angeles Police Department.

On *voir dire* examination outside the presence of the jury Sergeant Kinsey testified to the following effect: On December 3, 1962, defendant had been arrested in connection with the attempted robbery of Pip's Drive-In, a restaurant in Wilmington. Apparently, defendant and his friend McDowell about midnight had parked their car in front of Pip's; McDowell had masked his face and had gone in alone, leaving defendant in the car, and had attempted a robbery. However, three policemen had been in the restaurant and a gun battle had ensued wherein one of the policemen was wounded. McDowell somehow escaped, but defendant, still in the car, was arrested. Sergeant Kinsey, who had been involved in

investigating a series of drive-in robberies which included those involving Clancey's All-American (November 11, 1962) and McDonald's (November 26, 1962), began interrogating defendant about 10 a.m. on the day of the Pip's robbery, December 3, 1962. At no time was defendant advised of his rights to have counsel and to remain silent.[6]

Although Sergeant Kinsey suspected that defendant might have been involved in the series of drive-in robberies which he had been investigating,[7] it was his testimony that his initial questioning was substantially[8] confined to the attempted robbery of Pip's Drive-In, and that the primary subject of interrogation was the probable whereabouts of McDowell. Defendant denied any complicity in the attempted robbery of Pip's, saying that he was a " 'victim of circumstances,' " and told Sergeant Kinsey that his girlfriend, one Barbara Lunsford, would corroborate his story—which was essentially that McDowell had forced him to drive the car to the scene of the attempted robbery.

Sergeant Kinsey further testified on *voir dire* that later in the day he had a conversation with Barbara Lunsford, and that she corrborated defendant's version of his participation in the Pip's robbery but that she also said that defendant had been participating in other unspecified[9] robberies.

In the course of further interrogation during the evening of December 3, 1962, defendant was confronted with Miss Lunsford's general statement as to his participation in other rob-

---

[6]The interrogations in question, of course, took place more than two years prior to the decision of the United States Supreme Court in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758].

[7]Sergeant Kinsey testified that he was "a little dubious" as to whether defendant had been involved in the earlier robberies because he had remained in the car during the attempted robbery of Pip's, while in the other drive-in robberies two men had entered through the back door after closing time.

[8]"Q. [By defense counsel] Did you mention the Clancey robbery or the McDonald's robbery during the conversation with him in the morning? A. [By Sergeant Kinsey] Not to my recollection, I didn't. Q. You really can't remember, can you? It has been three years ago. A. Well, it has been a long time. I do recall that I was—practically all the conversation was focused on the Pip's Drive-In robbery, who he was with on this particular robbery and the circumstances surrounding that."

[9]"THE COURT: Had this woman mentioned the Clancey or McDonald's robbery or had she merely said that she suspected him of other robberies? THE WITNESS [Sergeant Kinsey]: She never mentioned any place specifically. She merely suspected or knew about robberies that he had committed. THE COURT: It was more than a suspicion, she knew? THE WITNESS: I told her, 'You know he has been committing robberies.' And she said, 'Yes, I know he has been involved in some,' and that is about as far as the conversation went."

beries. He then stated, " 'I didn't think she would tell you that,' " and " 'so long as she let the cat out of the bag, I might as well level with you.' " Thereupon, according to Sergeant Kinsey's testimony, defendant proceeded to relate the circumstances of several robberies which he and McDowell had committed, including the Clancey's[10] and McDonald's robberies.

Defendant also testified on *voir dire* relative to the circumstances of the 1962 interrogation. He said in substance that Sergeant Kinsey commenced the initial interrogation session on December 3, 1962, with a series of questions concerning "about 15 or 16 robberies" including those involving McDonald's and Clancey's; that although the attempted robbery of Pip's was mentioned during the interrogation, primary emphasis was laid upon the prior robberies; that Sergeant Kinsey specifically asked " 'Why don't you tell me about the Clancey job or the McDonald job?' "; that he freely admitted to Sergeant Kinsey his participation in the robberies preceding that involving Pip's because prior to the Kinsey interrogation the arresting officers, among whom Kinsey was not numbered, had already obtained a statement from him admitting such participation; that the prior statement to the arresting officers had consisted solely of his brief affirmative replies to inquiries concerning the previous robberies, such replies having been given by him because of the threat of violence on the part of the arresting officers; and that he (defendant) did not recall changing his story upon being confronted with the statements of his girlfriend Barbara Lunsford. In the course of his *voir dire* testimony defendant strongly implied that he and McDowell had in fact committed all of the robberies to which he had confessed; he continued to deny, however, that he was involved in the Pip's robbery except as a "victim of circumstances."

After argument on the basis of *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361] and related cases, the trial court held that the accusatory stage had not been

[10]Defendant's extrajudicial statement as to the McDonald's robbery related the circumstances of that robbery much as Mr. Meek had related them in his testimony. His statement as to the Clancey's robbery, however, as related by Sergeant Kinsey, differed in several respects from the account given by Mrs. Wininger. Whereas Mrs. Wininger had testified that the robbery took place at night after the establishment had closed for business, that the robbers had entered when one of the employees took out the trash, and that some $1,300 was taken, defendant's statement related that the robbery took place in the daytime, that entry was gained when a delivery man went through the back door, and that $400 was taken.

reached as to the McDonald's and Clancey's robberies prior to defendant's statement to Sergeant Kinsey admitting participation in such robberies. Defendant's objection to the admission of these statements was therefore overruled. The court then concluded that the question of admissibility was also to be determined by the jury, and that Sergeant Kinsey should therefore give before the jury, all testimony given on *voir dire,* prefaced by an admonition in the terms of former CALJIC No. 29-B (Revised).[11] Accordingly, when the jury returned to the courtroom it was admonished as indicated, and Sergeant Kinsey, after setting forth the foundational aspects of his testimony,[12] related defendant's confession to the McDonald's and Clancey's robberies.[13]

(3) *Evidence of defendant's plea of guilty to the McDonald's robbery.*

Betty Van Valkenburg, a court reporter, testified that she had reported certain proceedings in the Los Angeles Superior Court on January 30, 1963. She then read into the record her notes of such proceedings, which revealed that defendant, who had earlier entered a plea of not guilty to count 2 of an information (which count had charged defendant with a robbery, stipulated to be of the first degree, committed on November 26, 1962), on the indicated date entered a plea of guilty to that count.

---

[11]Former CALJIC No. 29-B (Revised) provided: "In determining the innocence or guilt of the defendant, you must not consider a voluntary admission or confession of the defendant, except as later stated in this instruction, if it appears from the evidence that: (1) the defendant was in custody when the admission or confession was made, and (2) the investigation by the authorities of the offense involved in this case had then ceased to be a general inquiry into an unsolved crime and had begun to focus on the defendant, and (3) the authorities at that time did not merely engage in a general questioning of the defendant, but subjected him to a process of interrogation that lent itself to obtaining incriminating statements.

"However, you may consider a voluntary admission or confession if the evidence establishes that before such interrogation: (1) the authorities effectively warned defendant of his absolute right to remain silent and of his right to be represented by counsel, and (2) defendant knowingly and intelligently waived the right to remain silent and to be represented by counsel."

[12]This case was tried prior to January 1, 1967, the effective date of the new Evidence Code, and the provisions of division 3, article 2 of that code (§§ 400-406) were therefore inapplicable. We express no opinion as to the procedure to be followed under the Evidence Code.

[13]Although Sergeant Kinsey indicated on *voir dire* that defendant had confessed to several robberies in addition to those involving McDonald's and Clancey's, his testimony before the jury, at the instance of defendant, related the confession only as it pertained to the McDonald's and Clancey's robberies.

Defendant contends that all evidence in each of the three indicated classes was erroneously admitted because the uncharged offenses whose commission was sought to be shown thereby lacked that kind of similarity to the charged crimes which is requisite to admissibility in the circumstances of this case.

■ The basic rules of law applicable to this contention were stated by this court in the recent case of *People* v. *Kelley* (1967) 66 Cal.2d 232, at pages 238-239 [57 Cal.Rptr. 363, 424 P.2d 947] : ''The general rule is that evidence of other crimes is inadmissible when it is offered solely to prove criminal disposition or propensity on the part of the accused to commit the crime charged, because the probative value of such evidence is outweighed by its prejudicial effect. [Citations.] ■ The purpose of the rule is to avoid placing the accused in a position of having to defend against crimes for which he has not been charged and to guard against the probability that evidence of other criminal acts having little bearing on the question whether defendant actually committed the crime charged would assume undue proportions and unnecessarily prejudice defendant in the minds of the jury, as well as [to] promote judicial efficiency by restricting proof of extraneous crimes. [Citations.]

''However, under certain limited circumstances, when the evidence is sufficiently relevant, it may be admitted even though it embraces evidence of the commission of another crime. In *People* v. *Peete, supra,* 28 Cal.2d 306 [169 P.2d 924], this court pointed out that 'except when it shows merely criminal disposition [citations], evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged,' and noted that the general test of admissibility of evidence in a criminal case is whether it tends logically, naturally, and by reasonable inference, to establish any fact material for the People or to overcome any material matter sought to be proved by the defense. (28 Cal.2d at pp. 314-315.) It has frequently been recognized, however, that because of the sound reasons behind the general rule of exclusion, the relevancy of evidence of other crimes, and therefore its admissibility, must be examined with care. (*People* v. *Peete, supra,* 28 Cal.2d 306, 316.) ■ The evidence should be received with 'extreme caution,' and if its connection with the crime charged is not clearly perceived, the doubt should be resolved in favor of the accused. (*People* v. *Albertson, supra,* 23 Cal.2d 550, 577 [145 P.2d 7]; *People* v. *Sykes, supra,* 44

Cal.2d 166, 175 [280 P.2d 769], dissenting opinion.) ▓▓ In every case the possibility of severing relevant from irrelevant portions of evidence should be considered to protect the accused from undue prejudice. (*People* v. *Dabb, supra,* 32 Cal.2d 491, 500 [197 P.2d 1].)''

▓▓ When, as in the instant case, a primary issue of fact is whether or not defendant rather than some other person was the perpetrator of the crime charged, evidence of other crimes is ordinarily admissible if it discloss a distinctive *modus operandi* common to both the other crimes and the charged crime. (See *People* v. *Peete* (1946) 28 Cal.2d 306, 319 [169 P.2d 924] ; *People* v. *Adamson* (1964) 225 Cal.App.2d 74 [36 Cal.Rptr. 894] ; *People* v. *Houston* (1963) 219 Cal.App.2d 187 [33 Cal.Rptr. 26] ; *People* v. *Scott* (1963) 218 Cal.App.2d 249, 253-254 [32 Cal.Rptr. 225] ; *People* v. *McCarty* (1958) 164 Cal.App.2d 322, 323-328 [330 P.2d 484] ; see also and compare *People* v. *Corral* (1964) 224 Cal.App.2d 300, 306 [36 Cal.Rptr. 591].)

''Several decisions have held that the test of admissibility of evidence of another offense offered to prove common design, plan, or *modus operandi* is whether there is some clear connection between that offense and the one charged so that it may be logically inferred that if defendant is guilty of one he must be guilty of the other.'' (*People* v. *Cramer* (1967) 67 Cal.2d 126, 129 [60 Cal.Rptr. 230, 429 P.2d 582].) It is apparent that the indicated inference does not arise, however, from the mere fact that the charged and uncharged offenses share certain marks of similarity, for it may be that the marks in question are of such common occurrence that they are shared not only by the charged crime and defendant's prior offenses, but also by numerous other crimes committed by persons other than defendant.[14] On the other hand, the inference

---

[14]Dean Wigmore states the general principle thus: ''The process of inference . . . operates by *comparing common marks,* found to exist in the two supposed separate objects of thought, with reference to the possibility of their being the same. It follows that its force depends on the *necessariness of the association between the mark and a single object.* Where a certain circumstance, feature or mark, may commonly be found associated with a large number of objects, the presence of that feature or mark in two supposed objects is little indication of their identity, because, on the general principle of Relevancy . . . , the other conceivable hypotheses are so numerous, *i.e.* the objects that possess that mark are numerous and therefore any two of them possessing it may well be different. But where the objects possessing the mark are only one or a few, and the mark is found in two supposed instances, the chances of the two being different are 'nil' or are comparatively small. Hence, in the process of identification of two supposed objects, by a common mark, the

need not depend upon one or more unique or nearly unique features common to the charged and uncharged offenses, for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together.[15]
■ Thus it may be said that the inference of identity arises when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses.

■ It is clear, of course, that the admission of other-offenses evidence to prove identity is essentially a matter within the sound discretion of the trial court. (*People* v. *Mc-Carty, supra,* 164 Cal.App.2d 322, 326; *People* v. *Roach* (1957) 148 Cal.App.2d 364, 368 [306 P.2d 523]; *People* v. *Grimes* (1952) 113 Cal.App.2d 365, 371 [248 P.2d 130].) However, that discretion must in all cases be exercised within the context of the fundamental rule that relevant evidence whose probative value is outweighed by its prejudicial effect should not be admitted. ■ We need not dwell upon the

---

force of the inference depends on the *degree of necessariness of association of that mark with a single object.*'' (2 Wigmore on Evidence (3d ed. 1940) § 411, p. 385.) (Original italics; fn. omitted.)

Professor McCormick states: ''Here [i.e. in the matter of proving identity by means of other-offenses *modus operandi* evidence] much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive *as to be like a signature.*'' (McCormick, Evidence (1954) § 157, p. 328.) (Italics added; fn. omitted.)

See also Comment: *A Proposed Analytical Method for the Determination of the Admissibility of Evidence of Other Offenses in California* (1960) 7 U.C.L.A. L.Rev. 463, 470-475.

[15]Dean Wigmore states: ''The process of constructing an inference of Identity thus consists usually in adding together a number of circumstances, each of which by itself might be a feature of many objects, but all of which together make it more probable that they coexist in a single object only. Each additional circumstance reduces the chance of there being more than one object so associated.'' (2 Wigmore on Evidence (3d ed. 1940) § 411, p. 386.) It would seem, however, that the truth of this statement finds limitation in the degree of distinctiveness of the marks considered. Thus, it would be possible to list any number of marks common to the charged and uncharged crimes each of which is so lacking in distinctiveness that its presence, whether or not in combination with other equally nondistinctive factors, is wholly lacking in significance. To give an example whose very absurdity illustrates the point, it might be observed that in both the charged and uncharged crimes the robber wore trousers, had two ears, etc. The sum of zeroes is always zero. Thus, it would seem that the distinctiveness of the common marks offered must always be a factor for consideration whether such marks are taken singly or in combination.

substantial prejudicial effect of evidence of defendant's prior offenses in a criminal case. Neither need we dwell upon the fact that such evidence has probative value only when it "'tend[s] logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense.'" (*People* v. *Peete, supra*, 28 Cal.2d 306, 315.) ▮▮▮ The important point to be made is that, when such evidence is introduced for the purpose of proving the identity of the perpetrator of the charged offense, it has probative value only to the extent that *distinctive* "common marks" give logical force to the inference of identity. If the inference is weak, the probative value is likewise weak, and the court's discretion should be exercised in favor of exclusion.

▮▮▮ Turning from these general principles to the facts of this case, we note that there exist a number of similarities between defendant's prior offenses and the charged offenses. For example, all of such offenses were committed when the establishment in question was closed for business but employees were nevertheless present.[16] All were committed by two armed Caucasian men of middle height who wore handkerchiefs over their faces. In each the robbers entered the particular place of business by means of a door normally used as an employees' entrance and exit and during the course of the robbery forced one or more employees to lie face down on the floor. In none of the robberies was an employee physically injured, although jostling, pushing, or kicking took place, apparently for the purpose of enforcing compliance with the robbers' orders. In each case one of the robbers seemed principally concerned with holding employees at bay, while the other appeared involved with obtaining money from the safe.[17]

---

[16]As indicated in footnote 10, *ante*, it would appear that the robbery of Clancey's related in the testimony of Mrs. Wininger is not the same one to which defendant confessed in his extrajudicial statement, for the former robbery is alleged to have been committed shortly after closing time, while that to which defendant confessed before Officer Kinsey was allegedly committed in the daytime. However, when defendant testified at the trial he indicated, as noted above, that he was responsible for the robbery of Clancey's which was the subject of Mrs. Wininger's testimony.

[17]It appears that none of the common marks indicated is capable of a more specific, and therefore more distinctive, description. Thus, although the perpetrators of both the charged and uncharged crimes were armed, one of them was sometimes armed with a knife, and no weapon observed was in any way unusual or distinctive. Although in all cases the robbers were masked with handkerchiefs, different kinds of handkerchiefs were observed at different robberies. The robbers favored no distinctive mode of dress or speech.

We do not think that any of these ''common marks'' (see fns. 14 and 15, *ante*) is of that distinctive nature necessary to raise a logical inference that the perpetrators of the prior offenses bearing such marks were the perpetrators of the charged offenses. (See *People* v. *Cramer, supra,* 67 Cal.2d 126, 129.) It is common knowledge that each and all of the indicated marks are shared not only by the charged and uncharged crimes herein involved, but also by very many armed robberies. The language of the court in *People* v. *Adamson, supra,* 225 Cal.App.2d 74, at page 79, is appropriate: ''If admission of proof of other crimes were to be hinged upon a showing of methods common to most or many robbery practitioners, then application of the inclusionary rule would be so broad as to nullify the principle that a defendant is not to be convicted because the prosecution can prove, on his prior (or subsequent) record, that he is a bad man. Assertion of the principle of exclusion as a preliminary to its avoidance becomes mere pretense.''

Our point is best illustrated by a brief consideration of certain cases wherein evidence of other offenses was admitted to show identity through a common *modus operandi*—and by a comparison of the marks relied upon in those cases with the marks in the instant case to which we have adverted above. Thus, in *People* v. *Adamson, supra,* 225 Cal.App.2d 74, the marks common to both the charged and the uncharged robberies included the peculiar manner in which one of the robbers held a gun and the fact that only currency and silver dollars were taken. In *People* v. *Scott, supra,* 218 Cal.App.2d 249, the perpetrator of both the charged and uncharged assaults with intent to rape drove a distinctive automobile and initially sought to attract the attention of his victims by blinking his headlights at them and driving alongside them. In *People* v. *McCarty, supra,* 164 Cal.App.2d 322, at page 326, the court listed several marks common to both the charged and uncharged robberies; among them were the robber's request that he be allowed to survey the premises prior to his demand for money, his distinctive manner of dress, his use of a very low tone of voice, and his use of ''remarkably similar'' expressions of speech. The instant case, on the other hand, involved no peculiarities of speech, conduct, or appearance tending to distinguish the charged and uncharged crimes from any number of other armed robberies perpetrated by persons other than defendant and McDowell.

We conclude that the common marks to which we

have adverted above (see text accompanying fn. 17), considered singly or in combination, are insufficiently distinctive to raise the inference of identity necessary to invest the other-offenses evidence with significant probative value, and that the admission of this evidence on the basis of these marks would constitute an abuse of discretion.[18]

It appears, however, that a common mark additional to those above considered is involved in this case. That mark, which seems to have been accorded little significance by the parties hereto, is the very presence of Donald McDowell as one of the perpetrators of both the charged and uncharged offenses.[19] It is clear that McDowell's presence, unlike the other features common to the charged and uncharged offenses, is a mark whose distinctive nature tends to differentiate those offenses from other armed robberies. There is only one Donald McDowell, and his conjunction with defendant in earlier robberies, together with his admitted participation in the robberies charged, supports the inference that defendant and not some other person was his accomplice in those charged offenses. It thus appears that evidence of the uncharged offenses has *some* probative value on the issue of identity.

It remains to be determined, however, whether the common mark of McDowell's presence, considered in combination with

[18]We observe in passing that the uncharged robberies (i.e., the drive-in robberies) were in many ways *dissimilar* to the charged robberies. Thus, the uncharged offenses involved small eating establishments and modest amounts of money, whereas the charged offenses involved large department stores and considerable sums of money. (Cf. *People* v. *Houston, supra,* 219 Cal.App.2d 187; *People* v. *McCarty, supra,* 164 Cal.App.2d 322.) Also, the robbers in the uncharged offenses took both coins and currency and carried the money away in the deposit bags of the victimized store, whereas in the charged crimes the robbers took only currency and silver dollars and carried the money away in paper bags brought by them for the purpose. (Cf. *People* v. *Adamson, supra,* 225 Cal.App.2d 74.) Although it is clear that an uncharged prior offense need not be identical to the charged offense in every detail in order to render evidence of such prior offense admissible on the issue of identity, the question in each case is whether there is support for the inference that the perpetrator of the prior offense (i.e., defendant) is the person who committed the charged offense; the presence of marked dissimilarities between the charged and uncharged offenses is a factor to be considered by the trial court in making that determination.

[19]Although the prosecutor in his offer of proof (see fn. 5, *ante*) mentioned in passing that McDowell was involved in both the charged and uncharged offenses, he did not place emphasis on this factor but instead concentrated his efforts upon the marks which we have above considered. The briefs of the parties likewise seem to attach little importance to the presence of McDowell in all offenses. At oral argument this point was raised from the bench through questioning of defendant's counsel, but the Attorney General in his argument offered no comment upon it.

the other common marks to which we have adverted, invests the evidence of other crimes with probative value sufficient to outweigh its clear prejudicial effect. We think that it does. Although, as we have stated, the other common marks are so lacking in distinctiveness that even considered in combination they would be insufficient to warrant admission, the addition of McDowell's presence—a significantly distinctive mark—into the combination yields a different result.

The issue in this case is the identity of McDowell's crime partner in the three charged robberies. The prosecution's identification evidence says that that crime partner was defendant. On the other hand, defendant and his alibi witnesses and McDowell himself say that that crime partner was not defendant. It is in this context that we assess the probative value of the other-crimes evidence. That evidence tends to show that on at least two[20] other occasions defendant had been McDowell's crime partner in robberies bearing other marks of similarity to the charged offenses.[21] It is clear that in this context the other-crimes evidence has great probative value on the issue of identity. (See *People* v. *Roach, supra,* 148 Cal.App.2d 364, 367-368.) ▆▆▆ We hold that that probative value was sufficient to outweigh the prejudicial effect of the evidence, and that therefore the admission of such evidence was proper[22]—provided that it was not inadmissible under some other exclusionary rule, a matter to which we now turn.

II. *Defendant's extrajudicial confession to other offenses.*

▆▆▆ Defendant next contends that it was error to admit, over objection, Sergeant Kinsey's testimony relating defend-

---

[20]As noted above, defendant testified at trial that he and McDowell had performed 10 to 15 robberies together.

[21]As we have indicated, the common marks other than McDowell's presence, whether considered singly or in combination, are insufficiently distinctive to warrant an inference of identity. This is not to say, however, that those marks, when considered along with the factor of McDowell's presence, are without weight in the process of determining probative value. The spectrum of distinctiveness ranges from the sheer commonplace to the unique; only those marks approaching the former extreme add nothing to the composite. (See fn. 15, *ante.*)

[22]Earlier cases of this court and of the Courts of Appeal have addressed themselves to contentions regarding the admission of other-crimes evidence to show identity without undertaking an analysis of the principles underlying such admission. Some of those cases are inconsistent in reasoning and/or result with such an analysis, which the foregoing discussion attempts to provide, and their authority as precedent must be limited accordingly. Among the cases to which we refer are *People* v. *Perez* (1967) 65 Cal.2d 615, 618-619 [55 Cal.Rptr. 909, 422 P.2d 597], certiorari granted March 4, 1968, *Perez* v. *California,* 390 U.S. 942 [19

ant's confession of the Clancey's and McDonald's robberies. We agree. As we have indicated, defendant was at no time prior to such confession advised of his right to counsel or of his absolute right to remain silent. (*People* v. *Dorado, supra,* 62 Cal.2d 338, 354-355.)

We reject the contention of the People that the interrogation had not reached the accusatory stage *as to the Clancey's and McDonald's robberies* prior to the confession. The prosecution's own evidence showed that at the time of defendant's confession to Sergeant Kinsey he had been in custody for some 18 hours and had been subjected to three periods of interrogation; that Sergeant Kinsey had been involved in the investigation of the Clancey's and McDonald's robberies, and he suspected that defendant was one of the two men involved in those robberies; that defendant's girlfriend, Barbara Lunsford, had been questioned relative to defendant's alibi as to the attempted robbery of Pip's and had in fact corroborated that alibi but had also stated that defendant had been involved in other robberies; and that Sergeant Kinsey, after confronting defendant with this latter statement, obtained the confessions in question. We conclude without hesitation that, "analyz[ing] the total situation which envelop[ed] the questioning" (*People* v. *Stewart* (1965) 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97], affirmed *sub nom. Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), the interrogating officer was, at the time of the confessions, carrying out a process of interrogation that lent itself to eliciting incriminating statements as to the series of drive-in holdups which included the Clancey's and McDonald's robberies. (See *People* v. *Marbury* (1965) 63 Cal.2d 574 [47 Cal.Rptr. 491, 407 P.2d 667]; cf. *People* v. *McFall* (1968) 259 Cal.App.2d 172 [66 Cal.Rptr. 277].) The accusatory stage was therefore reached before defendant's statements were obtained, and, since defendant was not advised of his constitutional rights at that time, and it does not appear that he waived those rights, it was error to admit such statements. (*People* v. *Dorado, supra,* 62 Cal.2d 338, 354-355.)[23]

---

L.Ed.2d 1131, 88 S.Ct. 1055]; *People* v. *Rosoto* (1962) 58 Cal.2d 304, 329-331 [23 Cal.Rptr. 779, 373 P.2d 867]; *People* v. *Coefield* (1951) 37 Cal.2d 865, 869-870 [236 P.2d 570]; *People* v. *Ollado* (1966) 246 Cal. App.2d 608, 611-615 [55 Cal.Rptr. 122]; *People* v. *Lindsay* (1964) 227 Cal.App.2d 482, 502-505 [38 Cal.Rptr. 755]; and *People* v. *Renchie* (1963) 217 Cal.App.2d 560, 562-563 [31 Cal.Rptr. 694].

[23]The fact that the evidence here in question was admitted for the

It remains to be determined, however, whether such error was prejudicial and requires reversal of the judgment.

It is clear at the outset that the characterization of such statements as "confessions" rather than "admissions" does not in the circumstances of this case require that the rule of automatic reversal normally[24] applicable to "confessions" come into play. The statements here in question did not constitute a confession of the *charged* crimes, or any of them, but rather constituted confessions to crimes as to which evidence had been admitted for the limited purpose of showing identity through *modus operandi.* "While we are satisfied that defendant's statements with respect to his prior offenses fall within the *Dorado* rule we find no language in *Dorado* or *Stewart* indicating that the characteristics of such statements as confessions in some way impregnate a subsequent unrelated case in which they are erroneously introduced so as to require automatic reversal." (*People* v. *Jack* (1965) 233 Cal.App.2d 446, 463 [43 Cal.Rptr. 566]; see and compare *People* v. *Coffey* (1967) 67 Cal.2d 204, 217-218 [60 Cal.Rptr. 457, 430 P.2d 15].)[25] We therefore proceed to undertake an assessment of prejudice in light of the entire record before us.

Since the error here in question is of federal constitutional dimension, it is clear that the assessment of prejudice must proceed in light of the standard enunciated in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*People* v. *Coffey, supra,* 67 Cal.2d 204, 218.)

That standard "requires reversal if, upon an examination of the entire record, it appears reasonably possible that the error might have materially influenced the jury in arriving at its verdict, and the error must be considered harmless if the

---

"limited purpose" of showing identity through *modus operandi,* rather than for a more comprehensive purpose, does not render such admission any the less *error.* (See *Commonwealth* v. *Padgett* (1968) 428 Pa. 229 [237 A.2d 209, 210]; cf. *People* v. *Coffey* (1967) 67 Cal.2d 204, 217-218 [60 Cal.Rptr. 457, 430 P.2d 15]; see also *Burgett* v. *Texas* (1967) 389 U.S. 109 [19 L.Ed.2d 319, 88 S.Ct. 258].)

[24]See *People* v. *Jacobson* (1965) 63 Cal.2d 319, 331 [46 Cal.Rptr. 515, 405 P.2d 555]; cf. *People* v. *Powell* (1967) 67 Cal.2d 32, 51-57 [59 Cal. Rptr. 817, 429 P.2d 137].

[25]Since the instant case was tried prior to June 13, 1966, the date of the *Miranda* decision, we are guided by *Dorado* and *Escobedo* standards rather than *Miranda* standards. (*People* v. *Rollins* (1967) 65 Cal.2d 681, 685-691 [56 Cal.Rptr. 293, 423 P.2d 221].) We intimate no opinion on the question whether, under *Miranda,* the admission of a confession obtained in violation of constitutional rights is per se prejudicial whether or not the confession is to the crime charged and whether or not such confession is admitted for a limited purpose.

likelihood of material influence is not within the realm of reasonable possibility." (*People* v. *Coffey, supra,* 67 Cal.2d 204, 220.)

■ We have concluded that the error, measured against this standard, was harmless.

As we have indicated above, the prosecution tied defendant to the robbery of McDonald's by two means: (1) his confession to that robbery, whose admission we have determined to be erroneous. and (2) his subsequent plea of guilty. It is clear that the guilty plea would have been sufficient in itself to show by a preponderance of the evidence (see *People* v. *Lisenba* (1939) 14 Cal.2d 403, 429-430 [94 P2d 569]; cf. *People* v. *Albertson* (1944) 23 Cal.2d 550, 579-581 [145 P.2d 7]) that defendant had been one of the perpetrators of the McDonald's robbery; thus the evidence of that robbery would have been admissible on the issue of identity even if the erroneously admitted confession had been excluded.

■ The same reasoning does not apply to the Clancey's robbery, for the prosecution introduced no evidence other than the confession specifically tying defendant to that robbery. If that confession had been excluded it appears that the prosecution could not have sustained its burden of proving that defendant was one of the perpetrator's, and evidence of the Clancey's robbery would therefore have been inadmissible against him. However, any impermissible prejudicial effect resulting from the admission of evidence relating to the Clancey's robbery was ameliorated by defendant's subsequent courtroom testimony, wherein he admitted his participation with McDowell not only in the Clancey's and McDonald's robberies but also in from 8 to 13 additional unspecified robberies.

It is contended that we may not consider defendant's courtroom testimony ameliorative of damage done by the erroneous admission of his invalid confession because such testimony was impelled by that confession. ■ "To overcome the likelihood that the erroneous introduction of defendant's extrajudicial confession impelled his testimonial one, the State bears the burden of showing that the causative link between the two confessions had been broken." (*People* v. *Spencer* (1967) 66 Cal.2d 158, 168 [57 Cal.Rptr. 163, 424 P.2d 715].) ■ We think that the state has sustained its burden in this regard. Since the evidence of the McDonald's robbery would have been admissible absent defendant's extra-

judicial confession thereto, the only adverse effect of the erroneous admission of that confession was, as we have shown above, that it permitted the evidence of the Clancey's robbery to be received. We do not think it reasonably possible that the presence of that evidence in the case impelled defendant to take the stand and confess to 10 to 15 robberies including those involving Clancey's and McDonald's. Rather, the decision to make that very damaging revelation was clearly grounded in a trial tactic calculated to explain a mass of evidence that was properly in the record, to wit, evidence that defendant had spent in excess of $15,000 between the time of the *charged* robberies and his apprehension therefor—even though he was unemployed at the time. Defendant and his counsel chose to explain this sudden affluence by recounting the history of defendant's extensive criminal activities with McDowell. We do not think it reasonably possible that the decision was significantly affected by the fact that evidence of two, rather than only one, uncharged prior offenses was before the jury.

For the foregoing reasons, and after an examination of the entire record in light of the standard enunciated in *Chapman* v. *California, supra,* 386 U.S. 18, we have concluded that the error committed by admitting defendant's extrajudicial confession to the Clancey's and McDonald's robberies was harmless.

III. *The Griffin error.*

Defendant next contends that the trial court committed error of the type condemned in *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], when it instructed the jury in the language of former CALJIC No. 30[26] to the effect that it could be inferred from defendant's silence or evasive replies in the face of accusations that he admitted the truth of such accusations. (See *People* v. *Ridley*

---

[26]Former CALJIC No. 30 read: ''If you should find from the evidence that there was an occasion when the defendant, under conditions which fairly afforded him an opportunity to reply, failed to make denial [, or made false, evasive or contradictory statements,] in the face of an accusation, expressed directly to him or in his presence, charging him with the crime for which he now is on trial or tending to connect him with its commission, and if you should find that he heard the accusation and understood its nature, the circumstance of his silence [and conduct] may be considered against him as indicating an admission that the accusation thus made was true. Evidence of such an accusatory statement is not received for the purpose of proving its truth, but only to explain the conduct of the accused in the face of it; and unless you should find that his conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement.''

(1965) 63 Cal.2d 671, 676 [47 Cal.Rptr. 796, 408 P.2d 124].) The Attorney General does not dispute the commission of error, but he urges that such error was harmless—even when measured by the standard set forth in *Chapman* v. *California, supra,* 386 U.S. 18.

The only evidence in the record to which the instruction could have related was that concerning conversations with police officers which occurred after defendant had been identified as one of the robbers at a showup. That evidence showed that defendant, after he had been placed under arrest and advised of his rights pursuant to *People* v. *Dorado, supra,* 62 Cal.2d 338,[27] refused to answer questions put by the officers and said that he would like to tell the officers "all about it" but he wished to see what evidence would be presented at the preliminary hearing before he did so; that he also stated that he wished to talk to McDowell before making any statement because he had pleaded guilty the last time he had been arrested (presumably for the McDonald's robbery) "and [had] been used against his crime partner, McDowell, at that time, and . . . he didn't think that that was a proper way of doing things and he didn't want to be involved in this manner again"; that he refused to respond to questions concerning the location of the getaway car in the May Company robbery; and that he expressed the opinion to the officers that his chances for eventual release would be improved if he withheld the details of "all the offenses that he had committed recently" from the police and instead related them to the Adult Authority parole board.

In the course of his closing argument the prosecutor referred to the foregoing evidence and argued therefrom that defendant's conduct and statements showed the response of a hardened criminal to evidence connecting him with, and inquiries concerning, a crime which he has in fact committed.

We consider that the error whose prejudicial effect we are called upon to determine is not limited to the giving of former CALJIC No. 30 but extends to the admission of evidence, above summarized, to which that instruction relates, and also to the prosecutor's argument on the basis of that evidence. (See *People* v. *Cockrell* (1965) 63 Cal.2d 659 [47 Cal.Rptr. 788, 408 P.2d 116].) ▓▓▓ Even though defendant has limited his specific contention to the giving of the instruction,

---

[27] These conversations, relating to the charged crimes, occurred subsequent to the *Dorado* decision.

it is clear that the *Griffin* error in this case is comprised of the admission of evidence of defendant's silence or evasive answers in the face of accusations *as well as* the giving of an instruction and the allowance of comment by the prosecutor upon such evidence.[28] We therefore proceed to determine whether the indicated three elements of the *Griffin* violation herein, taken together, resulted in prejudice to the defendant under the test set forth in *Chapman* v. *California, supra,* 386 U.S. 18.

The sole factual issue of substance in this case was whether defendant, rather than some other person, was McDowell's crime partner in the charged offenses. The prosecution's evidence on this question consisted of (1) showup identification evidence elicited from witnesses to the charged offenses, (2) evidence of other robberies which defendant had committed in the company of McDowell, and (3) evidence relating to cash expenditures made by defendant subsequent to the charged offenses. This evidence, while sufficient to support the finding of the jury, was not of such a clear and convincing nature as to render harmless the effect of the *Griffin* error. Of the eight identification witnesses presented, only three (one for each of the charged offenses) were able to positively identify defendant as one of the robbers, and one of these had previously identified another person as the robber in question.[29] None of these witnesses claimed to have seen the faces of either of the robbers at the time of the respective robberies for more than a few seconds, for the robbers always wore disguises of some kind. Similarly, the evidence of other offenses, which we have discussed in detail above, did not provide a strong basis for concluding that defendant was the second robber in the charged crimes—especially in view of the fact that defense

---

[28]Defendant offered no *Griffin* objection to the introduction of the evidence in question. Further, he neither opposed the giving of former CALJIC No. 30 nor objected to the prosecutor's argument. However, although *Griffin* itself was decided on April 28, 1965, several months prior to the trial herein, the *Cockrell* and *Ridley* cases—wherein we explained the application of the *Griffin* principle to *extrajudicial* statements or silences in the face of accusation—were not decided until six days after the rendition of the verdicts and two days after denial of the motion for new trial. In these circumstances we do not consider that defendant's assertion of the instant contention is barred by his failure to make proper objections at trial.

[29]Two showups took place in connection with this case. In the first some half-dozen witnesses identified Joseph Charles Hanson as McDowell's accomplice. Hanson, who was similar in appearance to defendant, was arrested and charged, but charges against him were dismissed after preliminary hearing.

evidence tended to rebut the resultant inference of identity by establishing an alibi and by asserting through McDowell himself that defendant had not been present during the charged crimes, although he had participated in the earlier offenses. Finally, the prosecution's evidence as to defendant's expenditures was contradicted by defense evidence asserting that defendant's affluence was attributable to his share of the proceeds from such earlier robberies. In this context we cannot conclude that the erroneous admission of evidence showing defendant's extrajudicial silence and evasive answers in the face of accusatory statements, together with an instruction permitting an inference of assent to be drawn from such conduct and comment by the prosecutor urging that that inference be drawn, was harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710].)[30] "[U]pon an examination of the entire record, it appears reasonably possible that the error might have materially influenced the jury in arriving at its verdict, . . ." (*People* v. *Coffey, supra,* 67 Cal.2d 204, 220.) The judgment must therefore be reversed.

IV. *Issues upon retrial.*

 Of defendant's several other contentions only one warrants our attention for the guidance of the court upon retrial. Defendant contends that he was denied his constitutional rights when he was required to appear at a showup without the assistance of counsel. Since the showup in question took place prior to June 12, 1967, the date of the decisions in *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926] and *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951] defendant may not rely upon those cases in order to assert a right to counsel grounded in the Sixth and Fourteenth Amendments but must instead demonstrate that the showup procedure resulted in a denial of due process of law. (*Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967]; *People* v. *Feggans* (1967) 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21].) Our

---

[30]Compare our conclusion in *People* v. *Ridley, supra,* 63 Cal.2d 671, at page 677, wherein we applied a pre-*Chapman* harmless error test to a similar *Griffin* error: "Under the instructions given 'there appears to be a substantial likelihood that the jury would have viewed Ridley's silence in response to the statement as an admission that he was involved in the offenses. . . . There are substantial conflicts in the evidence as to whether Ridley committed the offenses of which he was convicted, . . . Under the circumstances the errors require that the judgment be reversed.'' (Fn. omitted.)

examination of the entire record convinces us that the showup procedures in question comported with due process.

The attempted appeal from the order denying defendant's motion for a new trial is dismissed. The judgment is reversed.

Traynor, C. J., Peters, J., and Tobriner, J., concurred.

BURKE, J.—I concur with the majority's conclusions that proof of the prior crimes was properly admitted and that, although under *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], it was error to admit evidence of defendant's confession to the prior crimes, the error was not prejudicial.

However, I disagree with the majority as to both the scope of the *Griffin* v. *California*, 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] error and whether it was prejudicial.

The trial court instructed the jury in the language of former CALJIC No. 30 to the effect that it could be inferred from defendant's silence or evasive replies in the face of accusations that he admitted the truth of such accusations.[1]

The majority state, ''The only evidence in the record to which the instruction could have related was that concerning conversations with police officers which occurred after defendant had been identified as one of the robbers at a showup.'' Police Officer Savage testified: During a conversation with defendant concerning the robberies charged, after defendant had been advised of his rights to counsel and to remain silent pursuant to *People* v. *Dorado, supra,* 62 Cal.2d 338, defendant stated *''that he would like to tell us all about it, but he wanted to see the evidence that we had against him at the preliminary hearing, first.''* (Italics added.) Defendant also stated during the same conversation *he felt his chances for eventual release would be improved if he withheld informa-*

---

[1]Former CALJIC No. 30 read: ''If you should find from the evidence that there was an occasion when the defendant, under conditions which fairly afforded him an opportunity to reply, failed to make denial [, or made false, evasive or contradictory statements,] in the face of an accusation, expressed directly to him or in his presence, charging him with the crime for which he now is on trial or tending to connect him with its commission, and if you should find that he heard the accusation and understood its nature, the circumstances of his silence [and conduct] may be considered against him as indicating an admission that the accusation thus made was true. Evidence of such an accusatory statement is not received for the purpose of proving its truth, but only to explain the conduct of the accused in the face of it; and unless you should find that his conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement.''

*tion regarding "all the offenses that he had committed recently"* (italics added) *from the police and instead related it to the Adult Authority parole board.* Defendant further stated that he wished to talk to McDowell before making any statement because he had pleaded guilty the last time he had been arrested "and [had] been used against his crime partner, McDowell, at that time, and . . . he didn't think that that was a proper way of doing things and he didn't want to be involved in this manner again." Defendant refused to respond to questions concerning the location of the getaway car in the May Company robbery, and he never denied taking part in the robberies charged nor did he expressly admit committing any of those robberies.

The italicized statements contain admissions by defendant that were not inadmissible under *Griffin* v. *California, supra,* 380 U.S. 609. From the former italicized statement, in light of its context, it might be inferred that defendant had knowledge of the robberies charged and the latter italicized statement, in light of its context, might be understood as an admission by defendant that he had committed some or all of the robberies.

*Griffin* v. *California, supra,* "held that the California constitutional provision permitting comment on the failure of the defendant to testify (Cal. Const., art. I, § 13) was unconstitutional because it violated the Fifth Amendment privilege against self-incrimination made applicable to the states in *Malloy* by the Fourteenth Amendment. *Griffin* declared (at p. 614 [14 L.Ed.2d at p. 109]) that such comment 'is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly.' The rationale of *Griffin* implicitly proscribes drawing an inference adverse to the defendant from his failure to reply to an accusatory statement if the defendant was asserting his constitutional privilege against self-incrimination." (*People* v. *Cockrell,* 63 Cal.2d 659, 669-670 [47 Cal.Rptr. 788, 408 P.2d 116].)

However, where the defendant, instead of exercising his privilege against self-incrimination, makes statements containing admissions nothing in *Griffin* bars those statements. As previously pointed out, some of the statements held by the majority to be inadmissible under *Griffin* contain such admissions.

I agree with the majority that apart from such admissions the evidence in question was inadmissible and the giving of

the instruction and comment by the prosecutor were improper.

However, in my opinion the prosecution has met its burden of proving beyond a reasonable doubt that the error was harmless. (*Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) Although the improperly admitted evidence, in light of the instruction, permitted an inference that defendant admitted his guilt and also tended to impeach his credibility, other properly admitted evidence constituted clear and convincing proof of his guilt and impeached his credibility.

Three eyewitnesses (one to each of the robberies charged) positively identified defendant as one of the robbers,[2] and other eyewitnesses gave supporting testimony. Also, defendant admittedly committed 10 to 15 prior robberies with McDowell in 1962. He and McDowell admittedly escaped from prison together about a month before the November 28, 1964, robbery and thereafter lived together until about a week before that robbery. In addition there was evidence that defendant made the admissions recited above to Police Officer Savage, and Deputy Sheriff Varner testified that, after Savage's conversation with defendant, Varner told defendant, "It is our understanding that you neither acknowledge or deny your implication in the May Company robbery" and that defendant replied, "If I see they have enough at the preliminary, I will probably go for it." The prosecution also introduced proof that defendant, although unemployed, had spent sums of money aggregating over $15,000 during the period between the charged robberies and his apprehension.

Although defendant claimed that the $15,000 was the result of the 1962 robberies, he was unable to specify the exact location or name of many of the places robbed and admitted that he had previously accounted to his wife for his ability to spend large sums of money by stating that he had inherited it. He sought to establish an alibi and denied or attempted to

---

[2]Various observations of these witnesses lead to their identification of defendant. For example, a department store manager at J. C. Penney Co., testified that he got a "good look" at defendant during the November 28, 1964, robbery when he grabbed defendant's arm and looked "right up into his face" for several seconds after defendant's bandana fell down when he came toward the witness, that thereafter during the robbery he saw defendant from a distance of about six feet for maybe a minute or two, that the robbery lasted about 20 minutes, and that, in addition to his having observed the robber's face, a number of matters such as the robber's voice, which had a "theatrical roll," his manner of walking "leaning forward a little, with the shoulders bent forward," and his smooth hands enabled the witness at a lineup to identify defendant as the robber.

explain away the admissions testified to by Police Officer Savage and Deputy Sheriff Varner but his testimony was impeached by, among other things, proof of a prior felony conviction. Evidence of other defense witnesses was similarly impeached by proof of their relationship to defendant. Also, Officer Harris testified that, a few days before McDowell testified that one Edwards rather than defendant was his partner in the robberies charged, McDowell sent for Harris and said that since the officers had been "square" with him he would give them some information, that he was "going to have to say that [defendant] is innocent" because McDowell was going to prison and if he told the truth he would be known as a "fink" or "stoolie," would have to be placed in a security area in prison for his own protection, and did not want to serve his time under these conditions. McDowell denied having made the statements attributed to him by Harris, but McDowell's testimony was impeached by proof that he had been convicted of five felonies.

From my examination of the record I believe that the *Griffin* error was harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. 18.) Accordingly, I would affirm the judgment.

McComb, J., and Mosk, J., concurred.