Filed 3/21/16  P. v. Jackson CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| THE PEOPLE, | B259024 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA063472) |
| v. | |
| MICHAEL JACKSON, | |
| Defendant and Appellant. | |


APPEAL from the judgment of the Superior Court of Los Angeles County.  Allen Joseph Webster, Jr., Judge.  Affirmed in part, reversed in part with directions.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steve D. Matthews and Russell A. Lehman, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Michael Jackson appeals from his conviction on two counts each of armed robbery and false imprisonment, contending that the trial court erred by imposing a sentence greater than the one imposed before his successful appeal based on racially discriminatory jury selection practices by the prosecutor. We agree that the trial court erred and will order that the previous sentence be reinstated. We reject Jackson's contentions that the trial court erred by admitting evidence of a similar prior conviction or by allowing the jury to hear the previous trial testimony of two witnesses who the trial court found were unavailable for the latest trial.

### FACTS AND PROCEDURAL HISTORY[1]

Through four previous trials the essential facts have remained unchanged. At around 1:00 a.m. on June 19, 2001, Michael Jackson and an accomplice stole a truck trailer containing around $30,000 in merchandise from Universal Warehouse in Carson after pointing a gun at security guards Jose Barrera and Luni Tolai and then locking them in the trunk of Barrera's car. Jackson drove up to the guard shack in a truck tractor posing as a driver who was there to pick up a trailer and, after entering the shack on the pretext of looking for his paperwork, initiated the robbery.

The first trial ended with Jackson's conviction on two counts each of armed robbery (Pen. Code, § 211) and false imprisonment (Pen. Code, § 236) and a state prison sentence of 133 years.[2] We reversed the judgment in that case because the trial court erred by allowing evidence that Jackson took part in seven uncharged warehouse robberies in the 1980's and 1990's. (*People v. Jackson* (Sept. 29, 2003, B160746 [nonpub. opn.] (*Jackson I*).)

In 2004, a retrial ended with a mistrial and yet another retrial. At the first and second retrials Jesus Herrera testified that he was a security guard at the Universal

---

[1] Our statement of facts is based in part on our three previous decisions in this matter, which we describe below.

[2] All further undesignated section references are to the Penal Code.

Warehouse in 1994 when Jackson and another man robbed them at gunpoint. The second retrial ended with another conviction on all four counts and a state prison sentence of 69 years. Jackson appealed again. We rejected his contention that the prosecutor violated *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) by rejecting prospective African-American jurors based on their race. However, we concluded that the trial court should have stayed both false imprisonment sentences under section 654. We declined to remand for resentencing because the prosecutor had waived the issue by not objecting to the trial court's lawful discretionary decision to run the two robbery sentences concurrently. As a result, we reduced Jackson's sentence to a combined total of 40 years to life by ordering that the combined 29 year sentence for false imprisonment be stayed. (*People v. Jackson* (Dec. 27, 2005, B177201) [nonpub. opn.] (*Jackson II*).)

In *Jackson II*, we rejected Jackson's claim of *Wheeler* error by relying on the then-current state of California law that did not permit a comparative analysis of the prospective jurors for the first time on appeal. That rule changed in 2008 when our Supreme Court decided *People v. Lenix* (2008) 44 Cal.4th 602. Jackson later filed a habeas corpus petition in federal district court contending that we had misapplied federal law. The district court agreed and ordered that Jackson be released within 90 days unless we heard Jackson's comparative juror analysis argument within that time frame. After hearing Jackson's argument, we reversed the judgment for *Wheeler* error and remanded for further proceedings. (*People v. Jackson* (June 13, 2013, B177201) [nonpub. opn.] (*Jackson III*).)

At the third retrial (fourth trial) the jury again convicted Jackson on two counts each of armed robbery and false imprisonment. The trial court imposed a state prison sentence of 75 years, in part by running the two robbery sentences consecutively while staying the sentences on the two false imprisonment counts.[3] Jackson appeals,

---

**3** From the trial court's statements and the abstract of judgment, the sentence appears to have been calculated as follows: On each of counts 1 and 2, for the robberies of Tolai and Barrera, indeterminate terms of 25 years to life pursuant to the Three Strikes law (§§ 211; 1170.12(a)-(d), 667(b)–(i)), plus an additional and consecutive term of 10

3

contending the trial court violated the double jeopardy principles of our state's Constitution by imposing a higher sentence than he received as a result of the previous trial. He also contends that the trial court erred by allowing evidence that he committed an armed robbery of the same warehouse in 1994, and by allowing the jury to hear the earlier trial testimony of Tolai, his 2001 robbery victim, and Jesus Herrera, the victim of his 1994 robbery, after finding that those witnesses were not available.

## DISCUSSION

1. *The Trial Court Properly Found That Herrera and Tolai Were Unavailable*

    1.1    <u>Applicable Law</u>

Jesus Herrera testified at Jackson's first and second 2004 retrials that he worked at the Universal Warehouse as a security guard in October 1994 when Jackson and another man detained him and two other guards at gunpoint, tied their hands, duct taped their mouths, and then robbed the warehouse. Luna Tolai had testified at all three previous trials and had identified Jackson as the 2001 robber each time. When the prosecutor was unable to secure the attendance of either witness at the third retrial, the trial court found that the witnesses were unavailable because the prosecutor had exercised due diligence in attempting to secure their attendance, and allowed the jury to hear their previous trial testimony. Jackson contends the trial court erred.

Although a defendant has the constitutional right to confront the witnesses against him (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15), a witness's previous trial

---

years for the firearm enhancement pursuant to section 12022.53(b). Counts 1 and 2 were ordered to run consecutive to one another. On each of counts 3 and 4, for the false imprisonment of Tolai and Barrera, indeterminate terms of 25 years to life pursuant to the Three Strike law (§§ 236; 1170.12(a)-(d), 667(b)-(i)), plus an additional 4-year term for firearm use enhancements pursuant to section 12022.5(a)(1). Counts 3 and 4 were ordered to run concurrent to all other terms. Though each of these counts were indeterminate terms, the trial court added only one five-year prior to the entire term, in violation of *People v. Williams* (2004) 34 Cal.4th 397, 403-405. We address sentencing in Part 3 of our Discussion.

4

testimony can be admitted if the witness is unavailable and if the defendant was a party to the earlier action and had the right and opportunity to cross examine that witness. (Evid. Code, § 1291; *People v. Friend* (2009) 47 Cal.4th 1, 67.) A person is unavailable as a witness if the party seeking to introduce their earlier testimony used reasonable diligence to secure their attendance but was unable to do so through the court's process. (Evid. Code, § 240, subd. (a)(5).)

Reasonable diligence in this context is the same as due diligence. (*People v. Fuiava* (2012) 53 Cal.4th 622, 675.) Although there is no rigid definition of due diligence, it suggests perseverance and untiring and earnest efforts of a substantial character. (*Ibid.*) Relevant considerations include whether efforts to locate the witness were timely, the importance of the witness's testimony, and whether leads to his whereabouts were competently explored. Because the facts surrounding the prosecutor's efforts to locate Herrera and Tolai are undisputed, our review is de novo and we independently determine whether the prosecutor exercised the proper diligence to secure the witnesses' attendance at trial. (*Ibid.*)

A lack of diligence in securing a witness's attendance usually involves perfunctory or negligent efforts by the prosecutor. (*People v. Bunyard* (2009) 45 Cal.4th 836, 855.) Diligence exists where the prosecutor's efforts were "timely, reasonably extensive and carried out over a reasonable period." (*Id.*) That additional efforts might have been made does not preclude a finding of diligence. (*People v. Fuiava, supra,* 53 Cal.4th at p. 677.) The prosecution does not have to periodically check in on every material witness. (*People v. Friend, supra,* 47 Cal.4th at p. 68.) However, the prosecutor must take adequate steps to stop a witness from disappearing when he knows there is a substantial risk the witness will flee. (*Ibid.*)

1.2     The Prosecutor's Attempts to Locate Herrera

The trial court held a due diligence hearing regarding Jesus Herrera after jury selection ended but before any evidence came in. Emilio Guerrero was the district attorney's investigator assigned to locate and subpoena witnesses for trial. On

5

August 12, 2013, Guerrero tried to serve a subpoena on Herrera, but was told that nobody by that name lived at the address listed on the subpoena. An internet search located an address in Anaheim, but that turned out to be a medical clinic. The employees of the clinic did not know Herrera.

A DMV record search turned up a Corona address for Herrera. Another investigator named Barragan went to that address on October 10, 2013, where he found Herrera's son. The son said Herrera lived at that address but was in Mexico and would return around the end of that month. The son promised to give his father Guerrero's phone number and have his father call Guerrero after he returned. Guerrero also called a phone number he had obtained for the Corona house and left a message asking Herrera to call him back. Guerrero called twice more and was told that Herrera would return from Mexico in late October.

The prosecutor then called the Corona house on October 15 and 16, 2013. He left a message with the first call, then spoke with Herrera's young grandson the next day. The prosecutor gave the grandson his contact information and asked the boy to give Herrera that information. Herrera called the prosecutor the next day, said he would be back by October 30, and said the prosecutor should call him on November 1. The prosecutor called on November 1, but was told by the grandson that Herrera was still in Mexico. The prosecutor called again on November 4, 5, and 6, shortly before trial commenced, and left messages each time when nobody answered.

### 1.3    The Prosecutor's Attempts to Locate Luni Tolai

On November 8, 2013, soon after the prosecution began presenting evidence, the trial court held a due diligence hearing concerning the prosecution's efforts to secure the attendance at trial of Luni Tolai, a victim of the 2001 robbery who had testified at the three previous trials.

***Testimony of FBI Agent Calarco***

Christopher Calarco was an FBI agent in Los Angeles who had been a prosecution witness in previous trials based on an incriminating phone call he received from Jackson

6

shortly after the 2001 robbery. The prosecutor contacted Calarco on October 16, 2013, to let him know about the upcoming trial and to ask for help locating Tolai. Calarco determined that Tolai was living in the Las Vegas area and asked FBI agent Burke of the bureau's Las Vegas office to track him down.

Burke located Tolai and spoke with him on October 17, 2013. Burke told Calarco that Tolai was interested in cooperating and testifying at the new trial. Calarco relayed this information to the prosecutor so that travel arrangements for Tolai could be made. Calarco was told right before the new trial began that Tolai would testify, but was told on November 5, 2013, as jury selection was underway, that Tolai had not boarded his scheduled flight.

Calarco contacted Burke, who in turn contacted Tolai's employers to enlist their cooperation. Burke then overheard a phone conversation between Tolai and his employers, although the contents of that call were not described. Tolai's supervisors told Calarco they understood the urgency of the situation and would tell Tolai that he was obligated to testify and that he would not lose his job if he took time off to do so. Burke then went to the address provided by Tolai's employers but discovered the address did not exist. Further efforts by Calarco and Burke to reach Tolai over the next three days were unsuccessful.

Calarco testified that sometime between November 8 and 13 agent Burke located Tolai at work. Tolai told Burke he had started a new job as a taxi driver and had been in training the week before. He apologized for not keeping in contact. Calarco then called Tolai and left a message. Tolai called Calarco on November 12 and said he had taken the taxi driver job to augment his income, that he was scheduled to work that entire week, that his family's financial security was at stake, and that he would not come to Los Angeles for the trial.

### The Prosecutor's Offer of Proof

At the due diligence hearing the prosecutor also provided his account of the efforts made to have Tolai appear at trial. After learning that investigator Guerrero initially had been unable to locate Tolai, the prosecutor called Calarco on October 16, 2013 to ask for

help.  Later that day Calarco provided the prosecutor with a phone number for Tolai.  The prosecutor spoke with Tolai the next day.  Although Tolai questioned why he needed to testify yet again, he agreed to come so long as his travel expenses were paid.  At that point the trial was set to begin October 21, 2013, and the prosecutor told Tolai his flight would be on October 22.  At Tolai's request, the prosecutor spoke with Tolai's supervisor, who agreed not to schedule Tolai for work from October 22-25.

The prosecutor notified Tolai when the trial was continued to October 31 and confirmed with Tolai that he would fly to Los Angeles on November 5.  The prosecutor learned on the morning of November 5 that Tolai had not taken his scheduled flight.  Efforts were made to reach Tolai and inform him of other flights he could take.  The prosecutor left messages for Tolai over the next few days.

### 1.4     The Evidence Shows Due Diligence by the Prosecutor

Jackson contends the evidence shows a lack of due diligence by the prosecutor in securing Herrera's presence at trial because:  nearly two months elapsed between the time investigator Guerrero learned he had the wrong address for Herrera and his subsequent and ultimately successful efforts to locate Herrera's residence; the prosecutor made only four phone calls to Herrera after he failed to return as promised on November 1; there was no evidence that the prosecutor tried to find out what Herrera was doing in Mexico or where he was living; there was no evidence the prosecutor offered to fly Herrera back to Los Angeles; the prosecutor did not tell Herrera he needed to be back by a certain date; and the prosecutor did not initiate the procedures available under a treaty with Mexico to secure Herrera's attendance.[4]

Jackson contends the prosecutor did not exercise due diligence as to Tolai because:  even though Tolai had agreed to fly to Los Angeles on November 5, once he

---

[4]     The Treaty on Cooperation Between the United States of America and the United Mexican States for Mutual Legal Assistance, Sen. Treaty Doc. No. 100-13, eff. May 3, 1991, 27 I.L.M. 443 (the Treaty).)

failed to do so, the prosecutor erred by relying on Tolai's supervisors to encourage him to attend the trial; Calarco did not attempt to make personal contact with Tolai between November 5 and 8 because he believed he had some "wiggle room"; and the prosecutor should have immediately employed the Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases. (§§ 1334-1334.6; Nev. Rev. Stat., §§ 174.395 – 174.445 (the Uniform Act).)[5]

We believe the prosecutor exercised due diligence. The starting point for our analysis is that Herrera and Tolai had each willingly appeared when asked to testify at previous trials. Given this, the prosecutor was neither obliged to keep tabs on them or begin efforts to locate them at an earlier time. Once the prosecutor began his efforts, he expended considerable diligence in trying to locate them. After he did, each man promised to appear, with Tolai even agreeing to board a pre-arranged flight. Given Tolai's and Herrera's past cooperation and their promises to appear at the fourth trial, the prosecutor was not negligent in failing to invoke either the Uniform Act or the Treaty in order to secure their attendance at trial. Neither was he obligated to offer to make travel arrangements for Herrera, who, unlike Tolai, lived in the Los Angeles area and presumably intended to return home regardless of the trial.

2.     *Evidence of Jackson's Prior Warehouse Robbery Was Properly Admitted*

Over Jackson's objection, the trial court allowed Herrera and others to testify about Jackson's 1994 robbery of Universal Warehouse. The same issue was raised in connection with *Jackson II,* where we rejected Jackson's contentions that the evidence was not proper identity evidence (Evid. Code, § 1101, subd. (b)) and, even if relevant, was unduly prejudicial (Evid. Code, § 352).[6] Jackson raises the same arguments he did in *Jackson II* and acknowledges our ruling in that case, but asks that we consider the

---

**5**     The Uniform Act provides reciprocal procedures by which one state can seek the assistance of another state to compel the attendance of a witness at trial.

**6**     In *Jackson I, supra,* we agreed with Jackson that admitting evidence of *seven* prior uncharged robberies was unduly prejudicial under Evidence Code section 352.

issues again. Having reexamined our previous decision, we still find it persuasive. We therefore set forth in full our holding on this issue in *Jackson II* and readopt it here.

"The court admitted as proof of appellant's identity evidence that several years earlier he had robbed the very same warehouse at issue here. To prove identity, the similarity between a past crime and the current charged crime must be of the greatest degree. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403; Evid. Code, § 1101, subd. (b).) Appellant contends the court erred because the similarities between the earlier robbery in 1994 and the current offense, measured by the number and distinctiveness of features the two crimes shared, was inadequate. (*People v. Kipp* (1998) 18 Cal.4th 349, 370.) During the 1994 robbery, three security guards were on duty when three armed robbers, one of whom was appellant, entered the guard shack. One robber took a guard to search for cargo to steal while appellant and the second robber forced the other two guards to the back of the property, where appellant ordered them to lie down and tied them up. In the meantime, a fourth guard, unaware of the robbery, asked a robber on lookout duty whether the robber was there for a cargo pick-up. The lookout pulled out his gun and moved the guard to a cargo container, where he forced the guard to lie down.

"We review the court's decision to admit evidence of the 1994 robbery for abuse of discretion. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1239, overruled on another point in *People v. Edwards* (1991) 54 Cal.3d 787, 835.) Appellant argues the court abused its discretion because despite the similarities between the robberies, the differences between them were too important. (*People v. Weathers* (1969) 274 Cal.App.2d 232, 238-239 [dissimilarities can overcome similarities making evidence inadmissible].) For example, the guards were not restrained the same way in both robberies. In 1994, the robbers told the guards to lie down and tied them up. In the robbery here, however, the robbers locked the guards in a car trunk. In addition, the 1994 robbers stole a truck and trailer from the warehouse; here, however, the robbers arrived with a truck to which they attached the trailer they stole. The 1994 incident involved four robbers; the robbery here involved two. Finally, appellant's alleged role differed for each

10

crime. In 1994, he watched the guards, whereas here he posed as a truck driver arriving for a pick-up.

"Despite the dissimilarities, the robberies shared a number of similarities. For example, the robberies involved the same warehouse. (*People v. Catlin* (2001) 26 Cal.4th 81, 111; *People v. Gordon, supra,* 50 Cal.3d at p. 1240 [same victim is a similarity].) Both robberies occurred in the early morning. Both sets of robbers tried to catch the guards flat-footed with the ruse of one robber pretending to be a truck driver arriving for a pick-up. By not wearing masks, the robbers tried to avoid alarming the guards before the robbers could overpower them. The robbers herded the guards to a more secure location and physically restrained them to ensure they did not interfere with the robbery. Finally, when law enforcement located the stolen tractor trailers but had not yet arrested anyone, appellant called the FBI to set up an alibi by pretending to be a tipster reporting details of the robbery, including the robbers' identities and the tractor-trailer's location. (*People v. Ricketts* (1970) 7 Cal.App.3d 441, 445-446 [similarity of alibi or excuse admissible].) We find there were enough similarities to allow the court to admit the 1994 evidence without abusing its discretion.

"Appellant finally contends that, regardless of the similarities between the two crimes, evidence from 1994 was unduly prejudicial under Evidence Code section 352 because it was remote in time and showed his propensity to break the law. He asserts the prejudice is especially strong when the other crime is the same type of offense as the current one. (See *U.S. v. Frederick* (9th Cir. 1996) 78 F.3d 1370, 1376.)

"A trial court may exclude identity evidence if its prejudicial effect outweighs its probative value. (*People v. Padilla* (1995) 11 Cal.4th 891, 925, overruled on another point by *People v. Hill* (1998) 17 Cal.4th 800, 823; Evid. Code, § 352.) We review the court's balancing of prejudicial and probative value for abuse of discretion. (*People v. Kipp* (1998) 18 Cal.4th 349.) We find none here. The 1994 robbery was not the sort of crime that inflames passions or creates an undue emotional response. (*People v. Scheid* (1997) 16 Cal.4th 1, 19.) Moreover, the passing of time between it and the current offense might have been relevant to striking it as a prior conviction if it were being used

11

to enhance his sentence (*People v. Harris* (1998) 60 Cal.App.4th 727, 739), or on the issue of a testifying defendant's credibility. (*People v. Castro* (1985) 38 Cal.3d 301, 37; *People v. Green* (1995) 34 Cal.App.4th 165, 182.) However, appellant cites no authority that a prior crime's remoteness in time pertains when the earlier crime is offered not as a sentence enhancement, but to prove his identity."

We continue to adhere to our decision in *Jackson II* on this point and find no error in admitting evidence of the prior robbery.

3.     *The Maximum Allowable Sentence Was 40 Years to Life*

As a general rule, when a defendant successfully appeals a criminal conviction but is convicted again after remand for a new trial, California's constitutional prohibition against double jeopardy precludes the imposition of more severe punishment on resentencing. (*People v. Vizcarra* (2015) 236 Cal.App.4th 422, 431 (*Vizcarra*).) The rule advances two policies: (1) the state has no interest in preserving an erroneous judgment; and (2) a defendant's right to appeal is unreasonably impaired if he risks a greater sentence on retrial. In short, a defendant should not be required to risk a greater punishment on retrial for having exercised his right to appeal. (*Ibid.*)

There is an exception to this rule when a trial court imposes an unauthorized sentence. Increased punishment following a successful appeal and a new trial is not a penalty imposed on the appellant because of his appeal because correcting the judgment would be required whenever the mistake was discovered regardless of whether the defendant had appealed. (*Vizcarra, supra,* 236 Cal.App.4th at pp. 431-432.) A defendant who successfully attacks a judgment that exceeds the trial court's jurisdiction is not necessarily entitled to employ that invalid judgment as a limitation on what the court may do after a new trial. (*People v. Serrato* (1973) 9 Cal.3d 753, 765, disapproved on another ground in *People v. Fosselman* (1983) 33 Cal.3d 572, 583, fn. 2.) This rule protects the People's right to the imposition of lawful mandated sentences. (*People v. Craig* (1998) 66 Cal.App.4th 1444, 1449.)

A sentence that is not authorized by statute is illegal and does not preclude a greater sentence. (*People v. Brown* (1987) 193 Cal.App.3d 957, 961.) For example, the failure to impose mandatory enhancements makes a sentence unauthorized. (*Ibid.*) On the other hand, where the sentence is authorized but the trial court errs in the manner of sentencing, such as by failing to state the reasons for a sentencing choice, the sentence is not unauthorized and does preclude the imposition of a greater sentence. (*Id.* at p. 962.)

Respondent asks us to affirm the trial court's sentence in this case, which imposes a 75-years-to-life sentence even though we ordered a 40-years-to-life sentence in *Jackson II*. Respondent contends that the bar against increased punishment does not apply because: in *Jackson II* the trial court had imposed an unauthorized sentence; the 40-years-to-life sentence we ordered in *Jackson II* was imposed by this court, not the trial court; that we should have instead remanded for resentencing; and, after the federal district court conditionally granted Jackson's habeas corpus petition, our decision in *Jackson III* was an outright reversal of the judgment that had been on appeal in *Jackson II*, effectively negating the 40-year sentence we ordered in that case. We disagree.

While this case has a convoluted history, with four different sentences imposed over the course of years, established precedent prohibits us from following the path respondent asks us to take.

As we see it, it makes no difference that Jackson's 40-year sentence was the product of our decision in *Jackson II* and not initiated by the trial court. Once imposed, that became his sentence. It was both lawful and authorized. Indeed, respondent does not contend that our *calculation* of the sentence in *Jackson II* resulted in an unauthorized sentence. Instead, she contends that in *Jackson II* we should have chosen to remand the case to the trial court for resentencing rather than recalculate the sentence ourselves. In retrospect, the currently comprised appellate panel agrees that may have been a more prudent course. As respondent correctly notes, case law indicates that a trial court may reevaluate the entire sentencing scheme anew and can reconsider its sentencing choices after an appellate court determines its initial sentence was erroneous. (*People v. Hill*

13

(1986) 185 Cal.App.3d 831, 834.) Had the earlier panel chosen to remand, the trial court might well have lawfully chosen to run counts 1 and 2 consecutively in light of the error we pointed out in *Jackson II* – that counts 3 and 4 were inappropriately run consecutively in violation of section 654. We do, however, pause here to note that though respondent could have sought review by our Supreme Court on the point at that time, she did not, and the sentence is therefore final.

Returning to respondent's argument, the fundamental problem with her contention is that she has failed to present any authority for the proposition that an appellate court's decision to recalculate an unauthorized trial court sentence in a lawful manner, rather than remand the case to the trial court for resentencing, means the appellate court has imposed an unauthorized sentence. In our independent research, we have not found any authority for the proposition either. Whether the most prudent decision or not, by no means did the prior panel calculate or impose an unauthorized sentence in *Jackson II*. In a supplemental letter brief respondent acknowledges that the 40-year sentence was legally authorized. This being the case, there is no unauthorized sentence for us to correct now.

Last, we dispose of respondent's argument that after the federal district court conditionally granted Jackson's habeas corpus petition, our decision in *Jackson III* was an outright reversal of the judgment that had been on appeal in *Jackson II*, effectively negating the 40-year sentence we ordered in that case. The decision in *Jackson III* that reversed the judgment in *Jackson II* was solely the consequence of Jackson having availed himself of another avenue for appellate review by way of his federal habeas corpus petition. The effect was to initiate a new appeal on a legal issue unrelated to sentencing, and a reversal of a judgment that included a lawful and authorized sentence. Under the authorities we set forth in the initial portion of this section, Jackson may not be punished for having sought habeas relief from that judgment, and the trial court's sentence of 75 years to life impermissibly increased his punishment in violation of our state Constitutional prohibition against double jeopardy.

14

As a result, we will order that an amended abstract of judgment be prepared that fully and accurately accounts for each component of Jackson's sentence, including the enhancements that were found true. With this in mind, we observe that on every count where an indeterminate term is imposed the court must impose an additional and consecutive sentence for all conduct and status enhancements. (*People v. Williams, supra,* 34 Cal.4th at pp. 401-405; *People v. Thomas* (1997) 56 Cal.App.4th 396, 404; *People v. Anderson* (1995) 35 Cal.App.4th 587, 596.) Enhancements are a separate determinate sentence added in addition to each indeterminate sentence. (*Anderson, supra*; *People v. Ingram* (1995) 40 Cal.App.4th 1397, 1411-1412, disapproved on other grounds by *People v. Dotson* (1997) 16 Cal.4th 547; see also §§ 667, subd. (e) and (e)(2)(B).) As a result, the abstract must reflect a sentence of 25 years to life on count 1, the robbery of Tolai, with a consecutive 10 years for the firearm use enhancement (§ 12022.53, subd. (b)) and a consecutive five years for the prior prison term enhancement (§ 667, subd. (a)(1).) That is the 40-years-to life sentence which we originally ordered and which must be imposed on remand. The sentences on the other three counts should be imposed as follows: On count 2, the robbery of Barrera, a sentence of 25 years to life, plus a 10-year (§ 12022.53, subd. (b)) and a five-year (§ 667, subd. (a)(1)) enhancements fully consecutive to the base term in count 2. The term and enhancements on count 2 should be ordered to run concurrent with count 1. Finally, on each of counts 3 and 4, for the false imprisonments of Tolai and Barrera, a sentence of 25 years to life, plus a four-year gun use enhancement (§ 12022.5, subd. (a)) and a five-year prior prison term enhancement (§ 667, subd. (a)(1)) with the sentences on counts 3 and 4 including enhancements stayed under section 654.[7]

---

[7]     In addition to improperly imposing sentence on count 2 consecutively to count 1 in derogation of *Jackson II,* we also point out that the abstract is incorrect in other respects: (1) the abstract states that the sentences on Counts 3 and 4 are *concurrent* when those sentences are to be imposed and *stayed*; (2) the 10-year enhancements on counts 1 and 2 incorrectly state they are imposed under section 12022.53(a)(1) when the correct statute is section 12022.53(b); (3) the 4-year firearm enhancement for count 3 incorrectly states that it is imposed pursuant to section 12022.53(a)(1) when it is properly imposed

15

**DISPOSITION**

The judgment is reversed as to the sentence only, and the superior court is directed to amend the abstract of judgment to reinstate Jackson's 40-years-to-life sentence we ordered in *Jackson II* and make the other corrections to the abstract as set forth in the last two paragraphs of our opinion. The superior court is to forward a corrected copy of the abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.

FLIER, J.

---

under section 12022.5(a); (4) the 4-year enhancement for count 4 incorrectly states that it is imposed pursuant to section 12022.5(a)(1) when it is properly imposed under section 12022.5(a).